Jack HALVERSON, d/b/a Forest River
Potato Company, Plaintiff
and Appellee,

v.

PET, INC., a Delaware Corporation,
Defendant and Appellant.

Civ. No. 9379.

Supreme Court of North Dakota.

Jan. 11, 1978.

Rehearing Denied Feb. 2, 1978.

erwise provide approximately 10,000 hundredweight (cwt.) of potatoes suitable for processing into high quality potato chips." Under the contract, Pet agreed to buy that amount of potatoes and delivery was to be made "as needed", with the price per cwt. f. o. b. seller's field or warehouse, depending on delivery date, starting at $3.20 per cwt. at the time of harvest and increasing to a maximum of $4.95 per cwt. if delivered between March 16 and March 31, 1975. In the fall of 1974, Halverson harvested and stored in his facilities well in excess of 10,000 cwt. of Norchip and Kennebec potatoes.

The controversy in this case involves the fact that Halverson did not deliver any potatoes to Pet during the 1974–1975 shipping season. Halverson, who had been storing the potatoes in his own warehouse, dumped these potatoes in a field after March 31, 1975.

Halverson alleges that he was in a position to fulfill his contract with Pet by supplying 10,000 cwt. of potatoes meeting the standards set in the contract, but that shipping orders were never received from Pet, and as a result he was forced to dump his potatoes.

Pet asserts that the potatoes in Halverson's warehouse were never suitable for processing under the standards set out in the contract. It further alleges that it called for potatoes, but that Halverson would not ship them because he thought they would all be rejected.

This case was tried on October 28, 1976, before a judge of the Second Judicial District sitting without a jury. At the trial there was conflicting testimony over the condition of the potatoes and the conversations which took place between the two parties and their representatives.

The court rendered its memorandum of decision on April 1, 1977. The findings of fact, conclusions of law, and order for judgment were signed by the court, and judgment was entered on April 15, 1977. The court found in favor of Halverson and against Pet and awarded Halverson dam-

Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Grand Forks, for defendant and appellant; argued by James L. Lamb, Grand Forks.

Shaft, McConn & Fisher, Grand Forks, for plaintiff and appellee; argued by Patrick W. Fisher, Grand Forks.

ERICKSTAD, Chief Justice.

This is an appeal by Pet, Inc., a Delaware corporation, defendant and appellant (hereinafter Pet) from a judgment by the Walsh County District Court which found in favor of Jack Halverson, d/b/a Forest River Potato Company, plaintiff and appellee (hereinafter Halverson) and awarded Halverson damages for a breach of contract by Pet.

A written contract was entered into by the parties on January 15, 1974. It called for Halverson "to plant, care for, and harvest approximately _____ acres of potatoes during the growing season of 1974, or oth-

ages of $47,500 together with interest and costs. It is from the judgment based upon these findings that Pet appeals to this court.

On appeal, Pet asserts:

"I. The findings of fact by the trial court were clearly erroneous and against the great weight of the evidence.

"A. The trial court's finding of fact that a tender of delivery had been made by the plaintiff-appellee was clearly erroneous and unsupported by the evidence.

"B. The trial court's finding of fact that the condition precedent to the acceptance by defendant-appellant of the potatoes, that is: The existence of potatoes that would meet contract requirements—was clearly erroneous and against the great weight of the evidence.

"II. The trial court erred in concluding that the contract was oppressive and unconscionable and further erred in construing certain portions of the contract.

"III. The trial court committed reversible error in refusing testimony by defendant's witnesses relative to statements made by an employee-agent of the plaintiff."

■ As neither the findings of fact and conclusions of law nor the memorandum of the court conclude that the contract was unconscionable, we will not conclude from a mere comment made by the court at the time of hearing that the contract was unconscionable.

With the issue of unconscionability aside, did the court improperly construe the contract? We think not. The court construed the contract to require Pet to first request or demand delivery of a certain quantity of potatoes before Halverson became obligated to tender delivery of that quantity. This construction of the contract by the court can be seen both in the findings of fact and in the memorandum of decision.

Paragraph four of the findings of fact reads:

"4. That said potatoes were held subject to call by the Defendant pursuant to the marketing agreement."

This interpretation of the contract by the court is shown more clearly in its memorandum of decision.

"Where the buyer reserves the right to set the delivery date, 'as needed,' and reserves the right to elect the time of delivery when the buyer's vehicles are furnished at the warehouse or field, there is no valid reason why the seller should be required to tender delivery at any time. To do so would be a useless act."

In so construing the contract, the court also relied on another provision of the contract. It said:

"There is one provision in the marketing agreement which has not been particularly emphasized by either counsel but which to this Court appears to be one of the most revealing paragraphs of the entire contract. It provides as follows:

'Should grower not be able to deliver Buyer potatoes as described in above paragraphs when Buyer needs such potatoes, such quantity may be deducted from grower's contract which Buyer needed to secure elsewhere.'

This provision makes it clear when read in conjunction with all other provisions in the agreement that:

"1. Delivery of the potatoes are to be at a time designated by the buyer."

Further on in the memorandum of decision, the court said:

"Any request for delivery by the buyer would have to be specific enough to advise the seller that the contract is reduced by the amount requested and not delivered."

Pet disagrees with this construction of the contract, and asserts that our law requires tender of delivery by the seller before the buyer becomes liable. Pet relies on the following statutes:

"The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." § 41–02–18, N.D.C.C. (U.C.C. § 2–301).

"1. Tender of delivery is a condition to the buyer's duty to accept the goods,

and, unless otherwise agreed, to his duty to pay for them. Tender entitles the seller to acceptance of the goods and to payment according to the contract." § 41–02–55(1), N.D.C.C. (U.C.C. § 2–507(1)).

"1. Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. . ." § 41–02–51(1), N.D.C.C. (U.C.C. § 2–503(1)).

The district court dealt with these sections in the following manner in its memorandum of decision:

"The sections of the Uniform Commercial Code cited by defendant in support of its contention that 'tender' of potatoes meeting the contract standards was first necessary anticipates that there is no written provision to the contrary. Section 41–01–02(3) [U.C.C. § 1–102(3)] provides:

'The effect of provisions of this title may be varied by agreement, except as otherwise provided in this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.'"

The court then construed the agreement to vary the normal rules of tender as set out in the U.C.C. It concluded that the contract required a request or demand by the buyer for delivery of a specific quantity of potatoes before the seller became obligated to tender delivery.

What is our scope of review in this case? In *Metcalf v. Security International Ins. Co.*, 261 N.W.2d 795 (N.D.1977), a case involving the construction of a contract, we said:

"The object of interpreting and construing a contract is to ascertain and give effect to the intention of the parties.

*Delzer Construction Co. v. New Marian Homes Corp.*, 117 N.W.2d 851 (N.D.1962). The construction of a written contract to determine its legal effect is always a question of law for the court to decide. *Floyd v. Ring Const. Corporation*, 165 F.2d 125 (8th Cir. 1948); *Connie's Const. v. Fireman's Fund Ins.*, 227 N.W.2d 207 (Iowa 1975). However, the interpretation of the parties' intentions as to the meaning of certain words or phrases in a written contract may involve either a question of law or a question of fact depending on whether or not the interpretation requires the use of extrinsic evidence. If the parties' intentions in a written contract can be ascertained from the writing alone, then the interpretation of the contract is a question of law for the court to decide. [Citations omitted.] If, however, the parties' intentions cannot be determined from the writing alone and reference must be made to extrinsic evidence, then those questions in regard to which extrinsic evidence is adduced are questions of fact to be determined by the trier-of-fact. [Citations omitted.]" 261 N.W.2d at 799.

In this case, the trial court was both trier of the facts and the law. It is our view that the intention of the parties can be ascertained from the written contract alone without resorting to the use of extrinsic evidence. As the court's interpretation of the contract between Pet and Halverson involved a question of law, we will examine and construe the contract in question without applying the clearly erroneous standard of Rule 52(a), N.D.R.Civ.P. This is not to say that we will not apply Rule 52(a) relative to the determination of issues of fact relevant in a latter part of this opinion, but that, as to the interpretation of the contract, we shall not apply it.

Upon examination of this contract and the statutes cited by the parties, we conclude that the court properly construed the contract. The fact that the delivery is to be "as needed" and that Pet is to furnish the vehicles for loading and transportation, indicates that the parties intended that Pet

must first demand delivery of a specific quantity of potatoes before Halverson is required to tender delivery. This seems especially proper as the potatoes may be "needed" by Pet any time from the harvesting of potatoes in the fall until March 31 of the following year. It is our view that pursuant to Section 41–01–02, N.D.C.C. (U.C.C. § 1–102), the agreement of the parties varied the normal rules of tender of delivery as set out in the Code.

Having concluded that a tender by Halverson was unnecessary pending a demand for delivery, we find it unnecessary to discuss Pet's contention that the trial court erred in finding that Halverson had made a tender of delivery. Incidentally, that it did not make such a finding is best understood from its memorandum of decision.

> "Without determining whether the plaintiff sustained the burden of proving 'tender' this Court finds that under the terms of the contract the burden of proving 'tender of delivery of acceptable goods' is not upon the plaintiff in this case, nor is it a prerequisite to compliance with the terms of the agreement."

The court went on in its findings of fact and memorandum of decision to state that Pet did not ask Halverson to deliver any potatoes during the contract period. It also found that during a substantial and material part of the time covered by the agreement, Halverson was able to provide 10,000 cwt. of either Norchip or Kennebec potatoes suitable for processing by Pet. These findings are set out in paragraph five of the findings of fact.

> "5. That during a substantial and material part of the time, covered by the Potato Marketing Agreement, the seller was able to provide 10,000 cwt. of either Norchip or Kennebec potatoes suitable for processing into high quality potato chips and that during such time period, the Defendant did not call for these potatoes as it agreed to do."

Pet contends on this appeal that those findings of fact by the district court were clearly erroneous. A finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *In re Estate of Elmer*, 210 N.W.2d 815, 820 (N.D.1973).

At the trial, there was conflicting testimony as to whether or not Pet requested Halverson to deliver any potatoes under the contract. Mr. Halverson testified that he received no order from Pet to deliver potatoes during the 1974–1975 shipping season.

On the other hand, Frank Lynch, who was a potato buyer and field manager for Pet during the 1974–1975 shipping season, testified that he, at times, did request Halverson or his employees to deliver potatoes. He testified specifically that in January and February, he called Halverson's secretary for the purpose of requesting delivery, but she informed him that there were no potatoes suitable for chipping at that time. He also testified that about the 10th or 12th of March he had a telephone conversation with Halverson in which they discussed shipping three or four cars of potatoes. Lynch testified that Halverson responded to that by saying that the only place the potatoes could go then would be to the dump.

There was also conflicting testimony and evidence as to whether or not the potatoes in Halverson's warehouse met the standards set out in the contracts in question. Halverson testified that he tested the potatoes at least once a week for frying color. Under the contract, the potatoes were required to be between three to five on the standard reference chart prepared by the National Potato Chip Institute. Halverson testified that he had potatoes that were suitable for processing and would meet all the requirements of his contract with Pet up until March 31, 1975. He did testify that he told his secretary to inform buyers that the potatoes were not suitable for chipping when he was in Hawaii from January 19 to January 29, 1975. Halverson further testified that in his opinion the potatoes in his warehouse exceeded the requirements set out in the contract. He also testified that he had tried to contact Lynch by telephone to inform Lynch that his potatoes were ready

but that he was unable to reach Lynch. These attempts to reach Lynch by the telephone were corroborated by the testimony of Halverson's son, Gregg, and Halverson's secretary, Irma Comma. Irma Comma also testified that the only time she told buyers that the potatoes were not suitable for chipping was while Halverson was in Hawaii.

Pet presented five witnesses in its attempt to establish that Halverson's potatoes were not suitable for chipping. Lynch, who during the time of the contract was an employee of Pet, testified that he had several contacts with Halverson during the 1974–1975 shipping season. He testified that in early December he and Raymond Oliveira, his boss, were told by Halverson that the potatoes were not ready yet. He testified that in late December he and his grandson, Martin Lynch, and Donald Jensen, a potato grower, visited Halverson's warehouse, and that Halverson was not present that day. He said that the Norchip potatoes were broken down and were too deteriorated to ship. He testified that he took several litmus paper tests of the Norchip and Kennebec potatoes and that the tests indicated the potatoes would be an eight, nine, or ten on the National Potato Chip Institute reference charts. Martin Lynch and Jensen also testified to the same effect. They all testified that the Norchips at that time were broken down and were not suitable for chipping.

Lynch further testified that he contacted Halverson's secretary on the telephone on January 15, 1977, and February 15, 1977, and that she informed him the potatoes were not suitable for shipment. He said that, on February 25, he was again at the warehouse and saw fry test results from tests made by Halverson. He testified that at that time there was much improvement in the potatoes and it looked like possibly in a week the potatoes might be ready if they kept progressing. He testified that on March 5, he called Halverson's secretary, who said there had been no change in the potatoes since he was last out there. Finally, Lynch testified that on March 10 or 12, he called Halverson, who told him that the only place the potatoes could go was the dump.

Raymond Oliveira essentially confirmed what Lynch testified to. He also stated that, had Halverson's potatoes been suitable, they would have requested shipment.

Finally, Norris Schjeldahl, a potato buyer for Fairmont Foods, testified for Pet. He said that Fairmont Foods had a contract with Halverson for potatoes suitable for chipping, but that Fairmont only accepted about 15% of the total quantity of potatoes set out in the contract. He testified that Fairmont's color standard was three to four and its specific gravity requirement was 1.075, but stated that its requirements were pretty much the same as Pet's requirements. He said he did not call for the rest of Halverson's potatoes under the contract because the processing plant people called and told him not to send any more of those potatoes because they were not ready to cut. He also testified that he informed Halverson of the fact that his potatoes did not meet the standards set by the contract.

The only other major evidence as to the suitability of the potatoes are Halverson's records of shipment to other potato buyers. These records show that Halverson shipped potatoes for chipping purposes to other buyers on various dates from November 6, 1974, until March 6, 1975.

Halverson states that these records show that he did have potatoes suitable for chipping purposes during the 1974–1975 shipping season. He testified that he was paid in full for all these deliveries and that none of them were rejected as unsuitable for chipping. He especially emphasizes the fact that the deliveries to Neil Block were not under contract and thus Block was under no contractual obligation to buy any of his potatoes.

Pet, on the other hand, points to the fact that these records indicate that the other buyers took only a small fraction of the potatoes contracted for with Halverson, and that this shows that his potatoes must not have been acceptable to the other buyers either.

This testimony reveals the great conflict in the evidence as to whether or not the

potatoes were suitable for chipping, and whether or not any potatoes were actually ordered by Pet. It is important to note the interests of the witnesses. Halverson, his son, and possibly his secretary, have an interest in the outcome of this suit. Lynch, who testified that he is no longer employed with Pet, still owns about a million dollars worth of stock in Pet. His grandson and Jensen, the potato grower, also have an interest in maintaining good relations with Pet. Raymond Oliveira is a potato buyer for Pet and was Lynch's superior. Finally, Schjeldahl is a potato buyer for Fairmont, which company may still be subject to a suit for breach of contract by Halverson for not ordering all the potatoes called for in Fairmont's contract with Halverson.

■ After reviewing the entire evidence in this case, we are of the opinion that the answers to whether or not delivery of the potatoes was requested by Pet, and whether or not the potatoes were suitable for chipping under the contract, depend on whose testimony is believed. The trial court could have found either way on either question, depending on whose testimony was believed. In applying the clearly erroneous standard of Rule 52(a) of the North Dakota Rules of Civil Procedure, we will not set aside the trial court's findings unless the findings are clearly erroneous. As we are not left with a definite and firm conviction that a mistake has been made by the trial court in its findings of fact dealing with the suitability of the potatoes and the absence of requests for delivery by Pet, we affirm the court in respect thereto.

At this point, it should be noted that the trial court did not find that Halverson had potatoes in his warehouse suitable for chipping for the entire contract period. The findings of fact state that Halverson had suitable potatoes for a substantial and material part of the time covered by the potato marketing agreement. In the memorandum of decision, the court said:

"The testimony of Mr. Lynch that on the 10th or 12th of March he conferred with the plaintiff and was informed that the potatoes probably were not in condition for shipping and would now have to be dumped is not refuted. It could not be said that after that date the plaintiff was in a position to deliver in accordance with the terms of the agreement."

■ Notwithstanding this analysis of the testimony, we believe the record shows that Halverson testified he had potatoes that were suitable for processing and would meet the requirements of the Pet contract up until the 31st of March. However, from the evidence the district court could have found that Halverson's potatoes were not suitable after March 10 or 12. This finding by the trial court, however, does not shift the burden away from Pet to request delivery of a specific quantity of potatoes. Since the district court found (and we have upheld that finding of fact) that no request for delivery of a specific quantity of potatoes was made by Pet, Pet is still in breach of the contract. Under the contract, a request for delivery of a certain quantity of potatoes was necessary even if the potatoes in Halverson's warehouse were not suitable. Under the contract, such a request is required for two reasons. First, if the request was made, Halverson could deliver the potatoes to the processing plant, if in his opinion the potatoes were suitable. If the potatoes were rejected at the processing plant, that would be Halverson's loss and not Pet's. Second, the contract specifically stated that Halverson "agrees to plant, care for, and harvest approximately _____ acres of potatoes during the growing season of 1974, *or otherwise to provide* approximately 10,000 hundredweight (cwt.) of potatoes suitable for processing into high quality potato chips." [Emphasis added.] If the potatoes in Halverson's warehouse were not suitable under the contract, he could "otherwise provide" the potatoes by buying them on the open market and still fulfill his contract. If potatoes were purchasable on the open market at a lower price than the contract price, purchasing replacement potatoes could reasonably have been profitable. Therefore, even if the potatoes in Halverson's warehouse were not suitable for the entire contract period, Pet still breached the

contract by not requesting delivery as required under the contract.

The last issue raised by Pet was that the trial court committed reversible error in refusing testimony by defendant's witnesses relative to statements made by an employee agent of Halverson. When this testimony was excluded, Pet made no offer of proof at the trial.

Rule 103(a)(2), North Dakota Rules of Evidence, reads:

"(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

\* \* \* \* \* \*

"(2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

We in the past have stated that the record is inadequate to raise the issue of exclusion of testimony without an offer of proof. *Cargill, Inc. v. Kavanaugh,* 228 N.W.2d 133, 141 (N.D.1975); *Jore v. Saturday Night Club, Inc.,* 227 N.W.2d 889, 896 (N.D.1975); *Johanson v. Nash Finch Co.,* 216 N.W.2d 271, 279 (N.D.1974). The only exception to that rule under our Rules of Evidence, is if the substance of the evidence was apparent from the context within which the question was asked. In this case the substance of the evidence excluded is not apparent from the context and, as no offer of proof was made, we find no error in that ruling.

Having determined that Pet breached its contract with Halverson, and there being no issue before us dealing with the determination of the amount of damages, we affirm the judgment of the district court.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.