James W. POWERS, Plaintiff and Appellee,

v.

Gary A. MARTINSON and Linda A. Martinson, husband and wife, and GM Enterprises, Inc., Defendants and Appellants.

Civ. No. 10005.

Supreme Court of North Dakota.

Dec. 22, 1981.

Tenneson, Serkland, Lundberg, Erickson & Marcil, Fargo, for plaintiff and appellee; argued by Armond G. Erickson, Fargo, appearance by Roger Minch, Fargo.

Aarestad & Briggs, Fargo, for defendants and appellants; argued by Wayne G. Aarestad, Fargo, appearance by Loren Jones, a third-year law student.

ERICKSTAD, Chief Justice.

This case involves the sale of a 12-plex apartment building located in Wahpeton, North Dakota, to James W. Powers in 1977. The building was constructed by GM Enterprises, Inc., and owned by Gary A. Martinson, Linda A. Martinson, and another couple. The sale was negotiated between Gary Martinson and James Powers. After the sale, James Powers encountered difficulties

with water seepage in the walls and ceilings of the apartment building. Along with the water seepage, several other problems surfaced and, therefore, Powers commenced an action in Cass County District Court against Gary A. Martinson, Linda A. Martinson, GM Enterprises, Inc., and Realty Corporation, alleging fraud, deceit, breach of implied warranties, and breach of express warranties. Subsequently, Realty Corporation was dismissed from the action. The action was tried before a jury of six beginning on March 24, 1981. The jury returned a verdict awarding $30,431.31 compensatory damages against all the defendants, $5,000 punitive damages against Gary A. Martinson and $5,000 punitive damages against GM Enterprises, Inc., plus interest. Judgment was entered on April 1, 1981. The defendants appeal from that judgment. We affirm.

Martinson and Powers have both limited their arguments to the following issues:

1. Did the trial court err by denying defendants' motion for a continuance?

2. Did the trial court err in applying the law of implied warranties to the facts of this case?

3. Did James Powers carry his burden of proving fraud and was it proper for the trial court to deny the defendants' motion for a directed verdict?

4. Were punitive damages properly awarded by the jury?

5. Were rulings made by the trial court during the course of the trial an abuse of discretion?

We will discuss each of the questions separately.

1. *Did the trial court err by denying defendants' motion for a continuance?*

Martinson contends that the trial court should have granted his motion for a continuance because he was misled by the trial court into believing that the issue of breach of implied warranties would not be at issue in the trial. Martinson argues that the issue of breach of implied warranties had been eliminated from the case. In support of that contention, he points to his brief in

support of his motion for summary judgment in which he argued that such warranties were not recognized in North Dakota. He contends that because Powers did not respond to that argument in his brief in resistance to defendants' motion for more definite statement, motion to amend answer, and motion for summary judgment, that Powers conceded breach of implied warranties was not at issue. We conclude that the trial court did not err in denying Martinson's motion for a continuance.

Powers' complaint against Martinson alleged that "... Gary A. Martinson and Linda A. Martinson and G.M. Enterprises, Inc. expressly and impliedly represented and warranted that said apartment building was well constructed with generally accepted building practices ..." and that such express and implied warranties were breached. Additionally, the complaint alleged that Martinson failed to disclose what was known to him and that failure to disclose constitutes fraud. Powers complaint, therefore, alleged breach of express and implied warranties, and fraud.

Though the complaint so alleges, Martinson contends that during the December 10 hearing on his motion for a more definite statement, motion to amend his answer, and motion for summary judgment, the theory of recovery based on breach of implied warranty was eliminated. He argues that the issue of implied warranties was inserted into the action again when Judge John O. Garaas received the case from Judge Michael O. McGuire sometime between the December 10 hearing and the March 24, 1981, trial date. Martinson argues that the expansion of issues to include implied warranties prejudiced him by not allowing him an opportunity to prepare to meet the implied warranties issue.

A review of the transcript of the December 10 hearing discloses that the issue of implied warranties was not eliminated from the case. In fact, several times throughout the hearing the court and Powers' attorney indicated that Powers' complaint against Martinson included both express and implied warranties. In ruling on

Martinson's motion for summary judgment, the court said:

"The Court does find that there is a question of fact as to the fraud issue and as to whether the defects exist or not. That is certainly a factual question for the jury. Whether they could have been discovered or not by the Plaintiff in just a cursory examination would be a question of fact for the jury. Whether the Defendant made express warranties, and it's indicated that he made *express or implied warranties*, whether he did or not, or in some other manner indicated warranties, this Court—or is for the jury." (Emphasis added.)

As neither counsel nor the court misled Martinson into believing that the issue of implied warranties was not in this case, Martinson was not prejudiced.

2. *Did the trial court err in applying the law of implied warranties to the facts of this case.*

Martinson contends that the trial court erred in applying the law of implied warranties to the facts of this case. Powers contends that the jury's award of punitive damages to the plaintiff makes moot the issue of whether or not the judge erred in instructing the jury on implied warranties in the sale of real estate. He asserts that because the jury awarded punitive damages to him they must have found fraud because they were instructed that fraud is the only theory of recovery that would support an award of punitive damages. We agree with Powers.

The jurors were instructed that punitive damages could not be allowed unless the defendants committed fraud or deceit. Further, the jurors were advised that although they were the sole judges of questions of fact, it was their duty to accept the law as given by the court, and to apply the law to the facts determined by them. We must assume, without acceptable proof to the contrary, that the jury followed the instructions given by the judge.

This court has held that errors in instruction as to one theory of a case cannot be held to be harmless if it is impossible to determine upon which of two theories the jury based its verdict. *Barta v. Hondl*, 118 N.W.2d 732 (N.D.1962). In *Barta* we said:

"A general verdict of the jury returned under a proper and an erroneous instruction cannot be upheld. The jury's verdict may have been founded on either of the two theories. If it was founded on the correct theory, the instruction on the erroneous theory would, of course, be harmless. But if the verdict is founded on the erroneous theory, it was clearly error. The general verdict of the jury makes it impossible for us to determine upon which theory the jury's verdict is based. The jury may have founded it upon the issue to which the erroneous instruction related, and that instruction may have been controlling in the jury's determination of the issues of this case.

"Therefore, the erroneous submission to the jury of one of several issues is ground for granting a new trial where the jury renders a general verdict and it is impossible for the appellate court to determine upon which of the issues the verdict is based." *Id.* at 736.

In the instant case, although the jury verdict was a general verdict, we *are* able to determine that the jury decided this case on a fraud theory. That determination is possible because the jury returned a verdict which included punitive damages. As we said, the jurors were instructed that punitive damages could be awarded only if they found that Martinson committed fraud or deceit.

Additionally, a party cannot assign as error that which is not prejudicial to him. *Holten v. Amsden*, 161 N.W.2d 478, 485 (N.D.1968). We do not find that Martinson was prejudiced in any way by the court's instructions on implied warranties. Although we do not express an opinion as to the law of· implied warranties in relation to the sale of real estate in North Dakota, we conclude that the evidence of water problems in the apartment house and the evi-

dence of code violations was admissible under a fraud theory of recovery of damages.[1]

As Martinson has not been prejudiced, we conclude that his contention that the trial court erred in giving the instruction on implied warranties in the sale of real estate is without merit.

3. *Did James Powers carry his burden of proving fraud and was it proper for the trial court to deny the defendants' motion for a directed verdict?*

Martinson contends that it was error for the trial court to deny his motion for directed verdict. The motion was made at the close of the plaintiff's case and again at the close of the defendants' case on the grounds that the plaintiff had failed to meet his burden of proof and had not produced sufficient evidence to warrant sending the case to the jury. Martinson argues that Powers had to prove the existence of fraud with "clear and convincing" evidence. He asserts that Powers failed to meet that burden of proof and had not produced sufficient evidence to warrant sending the case to the jury.

Martinson's motion for directed verdict was based on the following facts:

"... Mr. Powers was aware of the delamination of the siding, even before he entered into purchase money agreement; that he hired his own appraiser to advise him as to the condition and value of the premises; that his appraiser pointed out various water problems as well as the siding deterioration; that GM Enterprises did not own the 12-plex; that Mr. Powers and/or his agents had complete and total access to every portion of the building including those tenants in whose apartments the problems supposedly existed; and further, that Plaintiff never attempted to produce any evidence suggesting that Mr. Martinson was engaged in a course of deception with Mr. Powers."

In *Frank v. Daimler-Benz, A. G., Stuttgart,* 226 N.W.2d 143, 147 (N.D.1975), we said that the granting of a motion for a directed verdict "should be exceptional, rather than common . . . ." In paragraph 9 of the syllabus we said:

"A motion for directed verdict is to be granted only when the moving party is entitled to judgment as a matter of law, upon considering the evidence in a light most favorable to the party against whom the motion is made. It should be granted only when, without weighing the credibility of witnesses, only one reasonable conclusion can be reached." *Id.* at 144–145.

Actual fraud is defined in Section 9–03–08, N.D.C.C., as a suggestion, assertion, suppression, or promise made "by a party to the contract, . . . , with intent to deceive another party thereto or to induce him to enter into the contract."[2] Constructive fraud consists:

1. While we do not apply the law of implied warranties to the facts of this case, we do recognize that other jurisdictions have addressed the issue in similar factual situations. *See Barnes v. Mac Brown and Company, Inc.,* 264 Ind. 227, 342 N.E.2d 619 (1976) (Builder-vendor's implied warranty runs not only to first purchaser, but extends to subsequent purchasers and is limited to latent defects.); *Casavant v. Campopiano,* 114 R.I. 24, 327 A.2d 831 (1974) (Fact that builder-vendor rented out house for less than one year did not make subsequent sale of house to plaintiffs a resale of a used home excluding application of implied warranties.) *Contra Mazurek v. Nielsen,* 42 Colo.App. 386, 599 P.2d 269 (1979) (Implied warranty of habitability generally extends only to the immediate purchaser, thus applying only to "new" as opposed to "used" homes.); *Klos v. Gockel,* 87 Wash.2d 567, 554 P.2d 1349

(1976) (It is not enough to invoke the implied warranty of habitability of a house that the vendor contemplated an eventual sale of the house, the sale must be fairly contemporaneous with completion and not interrupted by an intervening tenancy unless the builder-vendor created such an intervening tenancy for the primary purpose of promoting the sale of the property.)

2. "Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

"1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

"2. In any such act or omission as the law specially declares to be fraudulent without respect to actual fraud." § 9–03–09(1) and (2), N.D. C.C.

When the evidence in this case is viewed in a light most favorable to Powers, the party against whom the motion was made, we believe that the trial court did not err in denying the motion for a directed verdict. It cannot be said when viewing the testimony presented to the jury that the only reasonable conclusion that could be drawn therefrom is that Powers was not defrauded.

The testimony disclosed that Martinson was aware of the problems with the building. He may have made some efforts to alleviate the problems but he was quite unsuccessful. There is much testimony which indicates that there were many latent defects in the building. Although Powers had an appraiser inspect the building, the testimony indicates that he could not have discovered many of the latent defects. The walls of the building were in some instances saturated to the extent that water collected inside the globes of light fixtures. Water accumulated in the walls to the extent that some became discolored around the windows. Martinson assured Powers that these water problems had been taken care of by cementing around three sides of the building. There is testimony to the effect that similar water problems persisted after the sale. The caretaker testified that the sheetrock on the walls was "very mushy . . . like a sponge." He said that he lightly placed his hand on the wall

and it went through the sheetrock. Through the hole in the wall he noticed water running down the inside of the outside wall of the apartment building.

The testimony indicates that the water problems were finally solved by Builders Management, Inc. (BMI), a firm hired by Powers. An employee of BMI, Gary Kraemer, testified that he traced the water problems to several defects. He testified that he discovered the facia board at the edge of the roof was too high, creating a valley on the edge of the roof where water would leak in and run down the inside of the walls. The shingles in this valley cracked so water could get through them. Kraemer testified that the facia board should have been installed flush with or below the roof board. He testified that this defect contributed to ruined sheetrock and carpeting.

Kraemer also testified that the staples in the roof shingles were not set deep enough, and they had worked through the tops of the tabs on the shingles causing them to leak. Apparently, someone tried to repair the defect by caulking over the top of some of the shingles. Kraemer testified that he found evidence that water had been getting in through the shingles.

Kraemer testified that the windows in the building did not have drip caps to prevent water from entering them. He testified that after he installed drip caps, which required some residing, the windows stopped leaking. Kraemer discovered a hole in a drain pipe in one of the walls. He found it because there was a wet spot on the wall even at times when there had been no rain. He testified that the hole was caused by a nail which was apparently pounded through the drain pipe when a kitchen cabinet was being installed.

Kraemer testified that a roof jack installed to cover a sewer vent stack was improp-

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

3. The suppression of that which is true by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or

5. Any other act fitted to deceive. § 9–03–08, N.D.C.C.

erly installed so water could get in near it. After he repaired it, it stopped leaking. He testified that the leaking roof jack contributed to the deterioration of the wallboard and carpeting. Kraemer testified that when he was called back to the building in early winter, he discovered there was not sufficient ventilation in the attic, therefore causing a frost buildup, and when the frost melted, water ran inside the building causing some of the problems in some of the ceilings in the building. He also discovered that vents from the upper apartment were vented into the attic.

Besides the water problems, there was testimony that the hot water heater was faulty. James Hunkins, an appliance repairman and serviceman in electric maintenance for Wahpeton Electric testified that he discovered that the lower element of the water heater was burned out and that it could not be fixed. In helping to replace the water heater, he discovered that it had been improperly wired.

Wayne Nordick, an electrician for Wahpeton Electric, installed the new water heater. He testified that the fuse box handling the old water heater was "just literally burnt up," because "the wiring supplying it was undersized and overfused." He had to put in a new fuse box and run a new feeder into it.

Powers hired a general contractor to reside the north and south ends of the apartment building. The testimony indicates that the work was done because the T–111 siding was installed with staples that had broken the outside veneer allowing water to get in between the plys. The contractor testified that normally this type of siding should last the life of the building. Additionally, it was undisputed that Powers had to install smoke detectors to satisfy a city ordinance which was in effect when the building was built and should have been installed when the building was originally erected.

Because most of the defects in the building were latent, neither the plaintiff nor his appraisers were able to detect them. Although Powers' appraiser mentioned that there was evidence of delamination of the siding and concern for leakage in a lower apartment, the testimony also indicates that Martinson had told Powers that the water seepage problem had been corrected by pouring concrete around the foundation. Furthermore, the appraiser testified that he didn't inspect the roof, crawl into the attic, inspect the hot water heater, or open up the walls. He did assume building codes had been complied with.

The Metropolitan Federal Savings and Loan Association also did an appraisal. Their appraiser testified that he was not told about any shortcomings in the building. He testified that he didn't go up on the roof or into the attic, didn't inspect the hot water heater or examine windows for any signs of leakage. He said he saw no evidence of water leakage on the upper floors. He testified that he depreciated the building at 25 percent because of housekeeping problems and an unattractive back entryway, but that the percentage would have been greater had he been aware of the problems with the roof.

One of the attendants, Izetta Reilley Rummel, didn't tell Powers about the water collecting in her light fixtures because she was not asked. She did testify, however, that her apartment was repainted "[i]n the end of September just as Jim [Powers] bought the building."

■ The existence of fraud is ordinarily a question of fact. *Watkins Products, Inc. v. Stadel*, 214 N.W.2d 368, 373 (N.D.1974). Viewing the testimony in the light most favorable to Powers, we conclude that the trial court did not err in submitting this case to the jury for its determination of questions of fact in light of the law relative to fraud.

4. *Were punitive damages properly awarded by the jury?*

The jury awarded punitive damages in the amount of $5,000 against Gary A. Martinson and $5,000 against GM Enterprises, Inc.

The jury was instructed that: "In an action founded upon fraud and deceit, if the wrongdoer has been guilty of malice or fraud ... you may award the injured party any further reasonable sum as an example to others and to punish the wrongdoer as you may deem just."

The jury was also instructed that: "[E]xemplary damages cannot be allowed against the Defendant ... unless you find that he wrongfully committed fraud or deceit or that he acted with malice or fraud ...."

The North Dakota Century Code provides that a jury may give exemplary damages, "[I]n any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice ...." § 32–03–07, N.D. C.C. The instructions given to the jury in this case simply indicate that when a defendant has been guilty of fraud, exemplary damages are proper. That instruction is consistent with Section 32–03–07, N.D.C.C.

The issue then becomes whether or not the instruction was proper in this case. As discussed previously in this opinion, because the jury was instructed they could award punitive damages only if they found fraud, and the jury is assumed to have followed the instructions, we conclude that the jury found Martinson committed fraud.

Martinson's obligation to not make fraudulent representations to Powers arises from law, not contract. The breach of that obligation, therefore, allows the jury to award exemplary damages under the provisions of Section 32–03–07, N.D.C.C.

The jury also awarded punitive damages against GM Enterprises, Inc., in the amount of $5,000. Martinson contends that the award was improper because GM Enterprises, Inc., did not own the apartment building, nor did it participate in the sale. A review of the record, however, discloses that the jury could have properly found that GM Enterprises, Inc. was involved in the sale.

Our review of questions of fact is limited to consideration of whether or not there is substantial evidence to sustain the jury verdict. *Buehner v. Hoeven*, 228 N.W.2d 893, 904 (N.D.1975). In determining whether or not there is substantial evidence to sustain the verdict, we will not invade the province of the jury to weigh evidence or to determine the credibility of witnesses. In reviewing the evidence, we will view it in the light most favorable to the verdict and if there is substantial evidence to support the verdict, we will not set it aside. *Id.*

Exhibit 15 is a copy of a work agreement between GM Enterprises, Inc., and James W. Powers. The agreement provides for the repair of several items on the apartment building. It reads in relevant part as follows:

"This agreement entered into this the 26th day of October, 1977 by GM Enterprises, Inc., Seller, and James W. Powers, Buyer ...."

It is signed:

"GM Enterprises, Inc.

/s/ Gary Martinson"

We conclude that because this agreement between the parties refers to GM Enterprises, Inc., as the seller, the jury was justified in concluding that Gary Martinson represented GM Enterprises, Inc., as the seller. Accordingly, the contention that punitive damages were improperly awarded in this case is without merit, there being substantial evidence to support the verdict of $5,000 in punitive damages against both Martinson and GM Enterprises, Inc.

5. *Were rulings made by the trial court during the course of the trial an abuse of discretion?*

Martinson alleges that the trial court made several rulings during the trial which constituted an abuse of discretion and reversible error. He sets forth 11 such specifications of error. We address each separately.

1. Martinson alleges that the court permitted Powers' counsel to lead witnesses on direct examination by overruling Martinson's counsel's objections to those questions.

■ Rule 611(c) of the North Dakota Rules of Evidence provides as follows:

"(c) *Leading questions.* Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination...."

The rule gives the trial court wide discretion over the mode and order of presenting evidence. This comports with our case law prior to our adoption of the Federal Rules of Evidence. *See* Comment to Rule 611, N.D.R.Ev. In 1931, this court held that leading questions should not be allowed in the examination in chief of a willing, intelligent witness, but that courts will not reverse a case for the violation of this rule unless prejudice results. *Crosby v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 61 N.D. 293, 237 N.W. 803 (1931). The court discussed the reasoning for allowing discretion to the trial court in permitting leading questions by citing the following language from *State v. Hazlett*, 14 N.D. 490, 105 N.W. 617, 618 (1905):

" 'Whether leading questions shall be permitted or not is necessarily very largely discretionary with the trial court, and its rulings in that respect will not be disturbed, unless it is apparent from the record that the discretion was abused to the prejudice of the appellant. It is often necessary to resort to leading questions in order to elicit facts from a witness, who, because of hostility, ignorance, diffidence or other reasons will not or cannot give fair and full answers. * * * The general rule, however, is that leading questions should not be allowed. * * * The rule is a salutary one, and should never be departed from unless the circumstances are such as to warrant an exception. * * * If the record shows that the circumstances did not in fact justify the departure from the rule, and the violation of the rule is such that prejudice to the objecting party may be reasonably inferred, the appellate court will not hesitate to reverse on that ground.' " 237 N.W. at 808.

Rule 611(c) of the North Dakota Rules of Evidence continues to give the trial court wide discretion in deciding whether or not leading questions should be permitted on direct examination of witnesses.

The Wisconsin Supreme Court, in interpreting the same language as Rule 611(c), N.D.R.Ev., held that the rule does not prohibit leading questions and that the trial court has broad discretion in determining whether or not the question is truly leading and suggestive and whether or not the circumstances justify a leading and suggestive question. *Jordan v. State*, 93 Wis.2d 449, 287 N.W.2d 509, 519 (1980). In that case the trial court allowed the prosecution to ask a witness a leading question because the witness could not fully remember a conversation. The Wisconsin Supreme Court, in holding that there was no prejudicial error, said: "Leading questions may properly be used in order to refresh the witness's recollection when her memory is exhausted." *Id.* (Citations omitted.)

In the instant case, Martinson argues that the following line of questioning was leading and that the trial court erred in overruling his counsel's objections:

"Q. Were there ever any other problems in the apartment that you remember?

"A. No, I don't, not right offhand.

"Q. Did you have any problems with frost inside of your apartment?

"A. Yes, just around the windows and on the windows.

"Q. Would it be on the walls at all?

"A. On the walls—

MR. ARRESTAD: Objection, leading.

"Q. Where would you see the frost?

"THE COURT: Whenever there's an objection, don't answer any more. The objection, was there frost on the wall, you objected it's leading? It's overruled, you may answer.

"A. It was on the wall behind the dresser.

"Q. Was that in the wintertime?

"A. Yes.

"Q. What happened when the frost thawed?

"A. It run down onto the carpet.

"Q. Did it cause any problem with the carpet?

"A. It shrunk wherever the water run, you know.

"Q. Do you know of any other problems in the apartment when you were there?

"A. No, not that I recall right off-hand, it's been so long.

"Q. It's been a long while, is that right?

"A. Yes.

"Q. Ever any problems with the hot water heater?

"MR. AARESTAD: Objection, leading again.

"THE COURT: That's overruled, you may answer that.

"Q. Were there ever any problems with the hot water heater?

"A. Yes, people would call me and tell me they wouldn't have any hot water. Then I'd have to go down in the laundry room and flip every breaker.

"Q. Was that—how often would that happen?

"A. Oh, depends on how much hot water people were using, once a day, probably twice a day.

"Q. Did you report that to Mr. Meerbach?

"A. Yes."

■ We are not convinced that the questions are leading but, assuming for the sake of argument that they are, we conclude that the questions used by Powers' counsel were necessary to refresh the witness's memory. The trial court did not abuse its discretion in permitting the questions under the circumstances.

■ 2. Martinson contends that the trial court's receipt into evidence of pictures of the apartment building taken in the summer of 1979 was prejudicial error because the pictures were not representative of the condition of the apartment building when purchased. The pictures were introduced, however, for the purpose of explaining to the jury how the siding had been put on the apartment building with staples which had broken the veneer on the siding. They were not introduced to show the condition of the building in 1977. Further, the jury was informed that the pictures were taken in the summer of 1979.

■ It is incumbent upon the party contesting the ruling of the trial court to show that the error complained of was prejudicial. *Haider v. Finken*, 239 N.W.2d 508, 518 (N.D.1976); *Gleson v. Thompson*, 154 N.W.2d 780, 788 (N.D.1967).

We conclude that it was within the trial court's discretion to receive the photographs with the explanatory information.

3. Martinson contends that because Powers was permitted to call an undisclosed witness he was surprised and prejudiced. The witness, Kathy Anderson, is the wife of Wilfred Anderson, a witness who was disclosed to Martinson long before the trial began. She was also one of Martinson's caretakers until the spring of 1977.

Kathy Anderson did not present any testimony which was not corroborated by another witness. She testified about problems experienced by tenants living in the building. The tenants about whom she testified had previously testified concerning those problems.

She testified that Martinson knew about the problems with the apartment building. This testimony was substantiated by other witnesses.

■ Because Kathy Anderson did not testify to anything which another witness had not testified to or concerning, we hold that the trial court did not err in permitting Powers to call her without previously disclosing her identity. It should be noted also that she was not a stranger, but someone whom Martinson should have been cognizant of as a possible witness or person with knowledge of difficulties with the apartment building.

4. There were two 12-plexes adjacent to the one at issue in this case which were also built by GM Enterprises, Inc. Powers testified that he had talked with Mrs. Swartzen-

truber, the manager of the other two 12-plexes as to their vacancy and occupancy levels. Martinson asked Mrs. Swartzentruber to give her opinion as to why there was a variance in the occupancy rate between Powers' apartment and the other two nearby apartments. The trial court did not allow Mrs. Swartzentruber to express her opinion. Martinson alleges that was error. When this testimony was excluded, however, Martinson made no offer of proof at the trial.

Rule 103(a)(2), N.D.R.Ev., reads:

"(*a*) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

\*　　\*　　\*　　\*　　\*　　\*

"(*2*) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

■ We have, in the past, stated that the record is inadequate to raise the issue of exclusion of testimony without an offer of proof. *Halverson v. Pet, Inc.*, 261 N.W.2d 887, 894 (N.D.1978). We said in *Halverson* that the "only exception to that rule under our Rules of Evidence, is if the substance of the evidence was apparent from the context within which the question was asked." In this case, the substance of Mrs. Swartzentruber's opinion is not apparent from the context and, because no offer of proof was attempted to be made, we find no error in the trial court's ruling excluding the testimony.

5. Martinson alleges that the trial court's decision to not admit testimony to the effect that Martinson had offered to pay for broken light globes on the grounds that that testimony went to the issue of settlement and was therefore not admissible, was error. Again, there was no offer of proof attempted to be made. Accordingly, as the substance of the evidence was not apparent from the context within which the question was asked, we find no error in the ruling of the trial court.

6. Martinson contends that because there were two similar buildings adjacent to the apartment building in question he should have been allowed to introduce testimony concerning the structural status of those buildings. The court refused to allow such evidence on the basis that those buildings existed under different conditions and circumstances.

As previously discussed, the testimony indicated that there were high levels of moisture inside the walls of the apartment building purchased by Mr. Powers. There was testimony that this moisture affected the exterior siding.

■ Although an offer of proof was made, it went only to show that the other buildings were constructed in the same manner as the building that Powers purchased. We conclude, therefore, that the trial court could reasonably have determined that testimony relative to the construction of the two apartment buildings adjacent to Powers' apartment building was irrelevant to the issues of this case.

■ 7. Martinson contends that the trial court erred by allowing Powers' counsel to ask Martinson questions which called for a legal conclusion. The question was whether or not the city ordinance requiring smoke detectors was in effect at the time the apartment building was built. The court ultimately took judicial notice of the building code and ruled that it was in effect at the time the building was constructed. We therefore hold that there was no prejudice to Martinson in requiring him to answer the question.

8. Martinson contends that the trial court erred in preventing him from amending his answer to allege failure of consideration as an additional defense.

Rule 15(a) of the North Dakota Rules of Civil Procedure allows a party to amend his pleadings only by leave of court or by written consent to the adverse party if the action has been placed on the trial calendar. It provides that, "leave shall be freely given

when justice so requires." Rule 15(a), N.D. R.Civ.P.

■ Martinson's attorney moved to amend his pleadings just before the plaintiff rested and he began presenting the defendants' case. The trial court denied the motion stating:

" . . . This action was started with the summons and complaint dated September 24th, 1979 and the note of issue was filed on January 4th, 1980. The answer was filed by the Defendants on October 16th, 1979. There was a hearing allowing the amendment to the answer resulting in an Order of this Court on December 19th, 1980 which at that time amended the complaint and the answer in some respects. Now, when the Defendant has— is about to proceed on its case in chief, he makes a motion to amend the answer. And I feel that it's not timely. I think that changing or allowing that amendment at this time would work an injustice and surprise and prejudice on the opposing side. I'm fully aware of the fact that amendments should be freely given under the Rules of Civil Procedure. But when these amendments are given leave to operate by the Court to the detriment of the other side, then the Court has got to weigh one against the other. I think it's too late . . . to get into it."

Because we have determined that the jury awarded damages based on fraud, we conclude that the trial court did not abuse its discretion in denying the motion to amend the answer to include the defense of failure of consideration. Failure of consideration would not be a defense to fraud.

■ 9. Martinson contends that the court erred in preventing further cross-examinations of Powers about the earnest money agreement. Martinson's attorney asked Powers, on cross-examination, why the selling price shown on the earnest money agreement was reduced from $190,000 to $185,000 and when the reduction took place. Powers' attorney objected to the question and the trial court sustained that objection. Powers had already testified on cross-examination why the selling price shown on the

earnest money agreement was reduced from $190,000 to $185,000 and when that was done. He said he had sold the apartment house owned by him previous to buying the Martinson apartment house for $5,000 less than his asking price. Accordingly, he testified that he and Martinson agreed to reduce the sales price of the Martinson apartment house from $190,000 to $185,000. Further examination, therefore, would have been repetitious. Gary Martinson later gave his explanation for the reduction of the purchase price shown in the earnest money agreement. The jury, therefore, had before it both the explanation of Powers and the explanation of Martinson. It was for the jury to decide which of the witnesses to believe, or, if possible, to reconcile the testimony. We therefore find no abuse of discretion in the trial court for this ruling and, therefore, find no error in the ruling.

10. Martinson contends that the trial court erred by receiving into evidence an abstract of title to the property in issue. He argues that title was not an issue and therefore the abstract of title was irrelevant.

■ Powers' counsel argued that the abstract was offered to verify the dates of the sale and to show title to the property. The trial court received the abstract of title into evidence ruling that it was relevant for those purposes. Because the date of the transaction was in issue and because Gary Martinson testified that GM Enterprises had sold the building to the Heifners and Martinson, which testimony was not supported by the abstract, we conclude that the abstract was relevant for both the purpose of showing the date of the transaction and for impeachment purposes.

■ 11. Martinson contends that the trial court erred in receiving into evidence exhibit "14" which was a detailed billing of the items repaired on the apartment building. Martinson argues that the bills were improperly received into evidence because of the lack of a proper foundation.

The foundation was laid by questions asked of Roger Geroy, an employee of Builders Management, Inc. Builders Management, Inc., was the management firm hired by Powers to manage and repair his apartment building. Geroy was the supervisor in charge of Powers' apartment building repair project. Mr. Geroy testified that all of the items on the bill were for materials received and applied to the plaintiff's property. He also testified that all the bills in the exhibit were submitted to Mr. Powers at least a year or a year and a half before the trial. He testified that the bill was not put together for purposes of the lawsuit. Mr. Geroy, as an employee of Builders Management, Inc., had personal knowledge of the billing. We therefore conclude that a proper foundation was laid and that the trial court did not err in receiving the exhibit.

We affirm.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.