822 F.2d 723
 23 Fed. R. Evid. Serv. 342
 Robert W. FROEMMING, David D. Owen, Paul J. Sentman and
Bruce F. Thompson, Appellees,
v.
GATE CITY FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellant.
Robert W. FROEMMING, David D. Owen, Paul J. Sentman and
Bruce F. Thompson, Appellees,
v.
Arvid P. BENSON, Appellant.
Robert W. FROEMMING, David D. Owen, Paul J. Sentman and
Bruce F. Thompson, Appellees,
v.
SUN SERVICE COMPANY, a North Dakota corporation, Appellant.
Robert W. FROEMMING, David D. Owen, Paul J. Sentman and
Bruce F. Thompson, Appellees,
v.
Warren T. COWGILL, Appellant.
 Nos. 85-5419 to 85-5422.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 8, 1986.
Decided June 9, 1987.
Rehearing Denied in Nos. 85-5419 and 85-5420 July 22, 1987.
 
 J. Philip Johnson, Fargo, N.D., for appellant.
 John D. Levine, Minneapolis, Minn., for appellees.
 Before ROSS, JOHN R. GIBSON, and FAGG, Circuit Judges.
 PER CURIAM.
 
 
 1
 We reverse the judgment of the district court entered on the jury's verdict and reverse the district court's direction of a verdict on the issues of breach of the partnership agreement and of breach of fiduciary duty for the reasons stated in Judge John R. Gibson's opinion, Parts IB, IC, II, and III, in which Judge Ross and Judge Fagg join. We affirm the district court's direction of a verdict on the issue of Sun Service being the alter ego of Gate City for the reasons stated in Judge Ross' concurring opinion, in which Judge Fagg joins. Judge John R. Gibson dissents from the decision of the court on this issue for the reasons stated in Part IA of his opinion.
 
 
 2
 JOHN R. GIBSON, Circuit Judge, stating the decision of the court in Parts IB, IC, II, and III, in which Judge Ross and Judge Fagg join.
 
 
 3
 These appeals arise from the dissolution of North Bismarck Associates, a partnership which owned and operated a shopping mall in Bismarck, North Dakota. Sun Service Company, Arvid P. Benson, Warren T. Cowgill, and Gate City Federal Savings and Loan Association (the "North Dakota partners"[1]) appeal from the district court's directed verdict against them on the claims of Robert W. Froemming, David D. Owen, Paul J. Sentman, and Bruce F. Thompson (the "Minnesota partners") that the North Dakota partners breached the North Bismarck Associates partnership agreement and breached various fiduciary duties owed to the Minnesota partners. The North Dakota partners also appeal from the judgment entered against them on the jury's special verdict awarding the Minnesota partners $1,051,561.41 in actual damages and $1,500,000 in punitive damages. The North Dakota partners argue that the district court erred in directing a verdict for the Minnesota partners, the parties carrying the burden of proof; in excluding expert testimony on the value of the shopping mall; and in submitting a punitive damage instruction on the breach of fiduciary duties as those duties arose from the partnership agreement, a contract. We reverse and remand for a new trial.
 
 
 4
 Briefly, the parties formed the North Bismarck Associates partnership on March 1, 1978. The partnership's only business was the ownership and operation of the Gateway Mall, a shopping center in Bismarck. Froemming, Owen, Sentman, and Thompson owned approximately 39% of the partnership; Sun Service, Benson, and Cowgill owned approximately 61%. Sun Service was wholly-owned by Gate City, a federally chartered mutual savings and loan association. Sun Service and Cowgill were the managing partners of North Bismarck Associates.
 
 
 5
 The mall was constructed and went into operation in the fall of 1979. A fundamental difference of opinion quickly developed among the partners over the advisability of long-term ownership and operation of the mall. In November of 1980, Cowgill, Benson, and Sun Service voted to sell the mall to a real estate syndicator for approximately $15,000,000. Under the terms of the partnership, approval of two-thirds of the partnership interests is necessary to sell a partnership asset. The North Dakota partners alone, owners of 61% of the partnership interests, could not effect a sale. There is evidence that the North Dakota partners, while continuing to seek offers to purchase the center, attempted to pressure the Minnesota partners into voting to sell through a variety of tactics[2] over the next three years.
 
 
 6
 After soliciting advice of independent counsel, the North Dakota partners concluded that they could effect a sale without the approval of the Minnesota partners by retiring a partner and subsequently liquidating the partnership assets. The partnership agreement provided that a partner could retire at any time upon giving notice to the partnership. The partnership then had the option of valuing and purchasing the interest of the retiring partner. If the partnership did not exercise this option, the partnership would be liquidated. Acting on this understanding of the agreement, Cowgill sent a notice of retirement to the partnership in April 1983. Sun Service and Benson evidently agreed to indemnify Cowgill for any loss he incurred by reason of his retirement, and to pay him a commission for the sale of the mall. The partnership voted not to pay for Cowgill's interest[3] and began the process of dissolution and liquidation.
 
 
 7
 Sun Service, as the remaining managing partner, commenced efforts to sell the mall. In April 1983, Sun Service filed a petition in state court to dissolve North Bismarck Associates and dispose of its assets. On December 13, 1983, Sun Service and Benson caused the partnership to enter into an agreement to sell Gateway Mall to an unrelated third party for approximately $13,400,000. The Minnesota partners continued to object to sale of the mall, and Sun Service did not obtain court approval. After some delay, the sale was completed on May 25, 1984. The partnership received a cash down-payment of $2,231,412.11; Cowgill was paid a $388,500 commission out of the down-payment. The balance was distributed to the partners.
 
 
 8
 Sun Service voluntarily dismissed the petition for dissolution after the sale of the mall. The Minnesota partners then filed suit alleging that the sale of the mall breached the partnership agreement and violated the fiduciary duties owed the Minnesota partners by the North Dakota partners. Gate City was also named as a defendant on the theory that it was the alter ego of Sun Service. At the close of the three-week trial, the district judge directed a verdict in favor of the Minnesota partners on a number of issues. The judge first directed that the jury find that Gate City was the alter ego of Sun Service in connection with the management of North Bismarck Associates. Des.Rec. at 509. He also directed the jury to find that the sale of the mall was a breach of the partnership agreement by Sun Service, Cowgill, and Benson. Id. The court further directed the jury to find that the sale of the mall involved breaches of fiduciary duties by Cowgill and Sun both as partners and as managing partners. Id. at 510. The court directed the jury to find that the payment of a commission on the sale of the mall out of partnership funds was a breach of fiduciary duties by Sun Service and Cowgill and that they and Gate City were jointly and severally liable for $150,553.46. Id. Also, the court ruled that the payment of certain attorney fees out of partnership funds was a breach of fiduciary duties for which Sun, Cowgill, and Gate City were liable in the amount of $7,197.45. Id. And, finally, the judge directed the jury to find that Sun Service's receipt of a portion of the management fee paid the mall's off-site managers was a breach of fiduciary duty for which Sun Service and Gate City were jointly liable in the amount of $32,073.50. Id.
 
 
 9
 The court submitted the remaining issues to the jury on a special verdict form. The jury awarded the Minnesota partners $634,000 as compensatory damages on the breach of the partnership agreement and $111,500 for wrongful dissolution. Id. at 511. The jury found that Benson was jointly liable with Sun Service and Cowgill for the payment of the sale commission. Id. Also, Cowgill and Benson were held jointly liable with Sun Service for the receipt of management fees. Id. Sun Service was found liable for breach of fiduciary duty in connection with the delay of the sale and was assessed $116,257 in compensatory damages. Id. The jury also found that Sun Service, Cowgill, and Benson acted with fraud, oppression, or malice in connection with their breaches of fiduciary duties, and assessed $1,000,000 in punitive damages against Sun Service, $400,000 against Cowgill, and $100,000 against Benson.
 
 
 10
 These appeals followed. The North Dakota partners challenge the entry of the directed verdicts, the exclusion of expert testimony on the value of the mall, and the award of punitive damages.I.
 
 
 11
 The district court directed a verdict, as we have already observed, on six issues. The North Dakota partners argue that the evidence on each issue was not sufficient to justify directing a verdict in favor of the parties bearing the burden of proof. After a careful review of the record, we conclude that, although the evidence as to each issue preponderates to a greater or lesser degree in favor of the Minnesota partners, we cannot say that all of these issues should have been taken from the jury.
 
 
 12
 The standards we apply in reviewing the entry of a directed verdict are familiar. "[T]he evidence, together with all of the reasonable inferences to be drawn therefrom, is to be viewed in the light most favorable to the nonmoving party." Cason v. Cook, 810 F.2d 188, 189 (8th Cir.1987); accord Schlothauer v. Robinson, 757 F.2d 196 (8th Cir.1985). We "may not consider the credibility of the witnesses or the weight of the evidence." McKnelly v. Sperry Corp., 642 F.2d 1101, 1105 (8th Cir.1981) (footnote omitted). Furthermore, we must "resolve direct factual conflicts in favor of the nonmovant, * * * [and] assume as true all facts supporting the nonmovant which the evidence tended to prove." Crues v. KFC Corp., 729 F.2d 1145, 1148 (8th Cir.1984) (quoting Dace v. ACF Indus. Inc., 722 F.2d 374, 375 (8th Cir.1983)); see also McGowne v. Challenge-Cook Bros., Inc., 672 F.2d 652, 655 (8th Cir.1982). If the evidence, considered in this light,[4] points all one way such that a reasonable jury could not conclude otherwise, a directed verdict properly may be entered. Schlothauer, 757 F.2d at 196; McKnelly, 642 F.2d at 1105 n. 3.
 
 
 13
 Of crucial significance, however, is the additional consideration that the district judge directed a verdict in favor of the parties carrying the burden of proof as to each of the six issues. Directing a verdict under these circumstances is, we have stated, "proper only in an exceptional case." Wilson v. United States, 530 F.2d 772, 777 (8th Cir.1976); see 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.02 (2d ed. 1986). "A verdict upon an issue of fact should not be directed in favor of the party who has the burden of proof with respect thereto, unless such fact is admitted, or is established by the undisputed testimony of one or more disinterested witnesses and different minds cannot reasonably draw different conclusions from such testimony." Powers v. Continental Casualty Co., 301 F.2d 386, 388 (8th Cir.1962) (quoting Woodmen of the World Life Ins. Soc. v. Reese, 206 Ark. 530, 176 S.W.2d 708, 712 (1943)). This is so because "[t]he factfinder is not compelled to believe the testimony of a witness even if it is uncontradicted." Id. at 388; cf. Peterson v. United States, 723 F.2d 43, 45 (8th Cir.1983) (factfinder not required to believe testimony of an interested witness); Anderson v. United States, 561 F.2d 162, 167 (8th Cir.1977) (the jury "need not accept as true the testimony of any witness"). The district court deprived the North Dakota partners of the opportunity to have the jury weigh and assess the credibility of the evidence presented by the Minnesota partners to establish their claims. As this evidence was not undisputed, nor provided by wholly disinterested witnesses, it was error to do so.
 
 A.
 
 14
 I first address the district court's determination that, as a matter of law, Sun Service was the alter ego of Gate City in the management of North Bismarck Associates. [This portion of the opinion, Part IA, states only the dissenting view of the authoring judge on the alter ego issue. The decision of the court on this issue is stated in Judge Ross' concurring opinion.] Gate City contends that there was sufficient conflict in the evidence under the applicable North Dakota standards for this issue to go to the jury. The Minnesota partners argue that the evidence overwhelmingly established that Sun Service was the alter ego of Gate City, and that a directed verdict was appropriate.
 
 
 15
 The burden of establishing a basis for piercing the corporate veil rested on the Minnesota partners. Jablonsky v. Klemm, 377 N.W.2d 560, 565 (N.D.1985). Whether to disregard the corporate entity and find that a corporation is the alter ego of its ownership or management is a question of fact rather than of law, and is "heavily factspecific." Id. (determination in a court-tried case reviewed on appeal as question of fact under clearly erroneous standard); see also 1 C. Swearingen, Fletcher Cyclopedia of the Law of Private Corporations Sec. 41.95 (1983) (whether affiliated corporation is a mere instrumentality of another is a question of fact). The North Dakota courts recognize a number of factors as significant to this determination, including:
 
 
 16
 [I]nsufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealing.
 
 
 17
 Hilzendager v. Skwarok, 335 N.W.2d 768, 774 (N.D.1983).
 
 
 18
 No one of these factors is dispositive. Jablonsky, 377 N.W.2d at 565. Moreover, "an element of injustice, inequity or fundamental unfairness must be present before a court may properly pierce the corporate veil." Id. at 564. This element of injustice is "the fundamental basis for disregarding the corporate entity."[5] Id.
 
 
 19
 The evidence relied on by the Minnesota partners in support of the directed verdict includes what they argue was Gate City's financial need[6] and desire to sell the mall from 1980 onward. They point to the facts that the president and sole employee of Sun Service was also an officer of Gate City and that the boards of directors of both corporations were identical. Thus, they contend, Sun Service had no separate existence from Gate City, and the latter orchestrated the former's conduct leading up to and culminating in the sale of the mall.
 
 
 20
 Certainly these facts, if proved, are relevant to the determination of whether to disregard Sun Service's corporate form. They go to the question of whether Sun Service was merely a facade for Gate City, see Hilzendager, 335 N.W.2d at 774, and whether it would be inequitable to shield Gate City from liability for what the Minnesota purchasers contend is misconduct through the device of separate corporate entities. See Jablonsky, 377 N.W.2d at 564. There is additional evidence in the record, however, that is relevant to these factors and the other factors detailed in Hilzendager: Sun Service observed corporate formalities, was sufficiently capitalized to conduct its business of real estate investment, and was not insolvent at the time it entered the partnership. Sun Service was organized principally to engage in real estate development and investment; Gate City was prohibited by federal regulations from engaging in like investments. Moreover, there is the additional consideration that this is a contract action, and the Minnesota partners chose to deal with Sun Service and were aware of its relationship with Gate City. This is unlike the situation of the ordinary tort victim, who does not choose to be run down by one corporation's truck rather than another. See Jablonsky, 377 N.W.2d at 565-66 n. 1. Thus, I do not think that the evidence on this issue points all one way, and I would conclude that reasonable jurors could differ as to whether Sun Service was Gate City's alter ego.
 
 B.
 
 21
 We next turn our attention to the district court's determination that the North Dakota partners breached the partnership agreement in selling the mall. The district court concluded that the partnership agreement was unambiguous, and that it forbade sale of the mall without either approval of two-thirds of the partnership interests or a court order. The North Dakota partners contend that at a minimum the agreement was ambiguous and the question of whether they breached it should have been submitted to the jury.
 
 
 22
 "The construction of a written contract to determine its legal effect is a question of law for the court to decide. The determination of whether or not a contract is ambiguous is also a question of law for the court to decide." Sorlie v. Ness, 323 N.W.2d 841, 844 (N.D.1982) (citations omitted). Once a contract is held to be ambiguous, "it is within the province of the jury to determine the intention of the parties." Stetson v. Investors Oil, Inc., 140 N.W.2d 349, 357 (N.D.1966); see also Sorlie, 323 N.W.2d at 844. "An ambiguity exists under a contract when rational arguments can be made in support of contrary positions as to the meaning of the language in question." Johnson v. Mineral Estate, Inc., 343 N.W.2d 778, 780 (N.D.1984). We conclude that the North Bismarck Associates partnership agreement was ambiguous as to the procedure for sale of partnership assets at dissolution; thus, a jury issue was created as to the intention of the parties.
 
 
 23
 The partnership agreement provides that the vote of the partners holding over 50% of the partnership interests "shall control any question that may come up for a decision in the ordinary course of business." Plaintiffs' Exhibit 16 at 5. Two-thirds of the partnership interests must approve any decision outside the ordinary course of business.[7] The agreement defines certain acts as being outside the ordinary course of business, including "[d]ecisions whether or not to sell, exchange, transfer, finance and refinance, mortgage, pledge, hypothecate or otherwise dispose of or encumber partnership property or any part thereof." Id. at 7. The district court evidently concluded that these provisions unambiguously governed sale of partnership assets at dissolution.[8]
 
 
 24
 Paragraph 9.06 of the partnership agreement, however, provides that a partner may retire from the partnership at any time after giving ninety-days notice to the partnership of his intention to do so. The partnership then has the option of buying out the retiring partner's interest.[9] If the partnership does not exercise this option, "the partnership shall be wound up and all of its properties distributed in liquidation." Id. at 9 (emphasis added). Paragraph 13.01 details the order in which "proceeds from liquidation of partnership assets," id. at 11, shall be distributed, and paragraph 13.02 recognizes the possibility that some property may be distributed in kind to the partners.
 
 
 25
 The agreement contains no special provision addressing the requirements applicable in the event of dissolution to accomplish a sale of partnership assets by a vote of the partners. Thus, the district court's interpretation of the agreement--that the two-thirds sale provision in paragraph 8.01 controls sale at dissolution--is logical and reasonable. The North Dakota partners, however, advance an equally logical and reasonable interpretation of the agreement. They argue that the use of the word "shall" in paragraph 9.06 makes liquidation of the partnership assets mandatory upon dissolution. "Whether or not to sell," the language relied on by the Minnesota partners, is discretionary. Following retirement of a partner and the decision of the partnership not to buy out his interest, there is no need to decide "whether or not to sell;" that decision has been made. The partnership has no alternative but to wind up its business and liquidate its properties, notwithstanding the lack of two-thirds of the partnership approving that course. The only decision left, to whom the sale is to be made, is arguably within the ordinary course of business under paragraph 8.01, and may be resolved by a simple majority of the partnership.
 
 
 26
 Because "rational arguments can be made in support of contrary positions as to the meaning of the [contract] language," Johnson, 343 N.W.2d at 780, we conclude that the North Bismarck Associates partnership procedure for sale of partnership assets at dissolution was ambiguous. The intention of the parties to the agreement was thus a question of fact for the jury to decide.[10] See Sorlie, 323 N.W.2d at 844. The district court erred in concluding that the agreement was unambiguous and directing a verdict in favor of the Minnesota partners for its breach.
 
 C.
 
 27
 We now consider the directed verdicts on the issues of breach of fiduciary duties by Sun Service and Cowgill as managing partners in selling the mall; by Sun Service and Cowgill for paying a commission out of partnership funds for sale of the mall; by Sun Service and Cowgill for paying attorneys' fees out of partnership funds; and by Sun Service for receiving a portion of the management fee paid the mall's off-site managers. The North Dakota partners contend that there was a sufficient conflict in the evidence for these issues to go to the jury.
 
 
 28
 A partnership is a fiduciary relationship.[11] See Svihl v. Gress, 216 N.W.2d 110, 115-16 (N.D.1974); Engstrom v. Larson, 79 N.D. 188, 55 N.W.2d 579, 587-88 (1952). The North Dakota Supreme Court has quoted approvingly Justice Cardozo's famous language from his opinion in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928), written while he was Chief Judge of the New York Court of Appeals:
 
 
 29
 Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.
 
 
 30
 Id. at 463-64, 164 N.E. at 546, quoted in Svihl, 216 N.W.2d at 115.
 
 
 31
 The North Bismarck Associates owed one another "the obligation of the utmost good faith and integrity." Engstrom, 55 N.W.2d at 587. "The mere fact that strained relations had grown up between the partners did not relieve * * * them from [their] duties and obligations." Oliver v. Uleberg, 74 N.D. 453, 23 N.W.2d 39, 43 (1946).
 
 
 32
 Implicit in all of these standards is the question of good faith. Good faith in turn depends upon the knowledge, understanding, and intent of the partner who is charged with breach of fiduciary duty, as well as the understanding, knowledge, and intent of his co-partners. It also depends upon the circumstances of whatever action is alleged to be a breach of duty. Necessarily, the determination of whether an action is undertaken in good faith requires the factfinder to weigh the credibility of the witnesses, gauge nuances of voice and expression, and sift through competing and conflicting versions of what occurred and what state of mind each actor brought to the occurrence. These are all emphatically matters for the jury. In granting the Minnesota partners' motion for a directed verdict on the breaches of fiduciary duties, the district court deprived the North Dakota partners of their right to have the Minnesota partners' theory of recovery tested by the jury. There is strong evidence in the record which, if believed, would support a jury verdict in favor of the Minnesota partners. We do not believe, however, that the evidence points all the way, so as to merit directing a verdict on these issues. There was sufficient conflict in the evidence as to the intent of the North Dakota partners, as to the state of knowledge of the Minnesota partners regarding the activities of the North Dakota partners, and as to the accepted practices in the sale of commercial real estate to submit the question of breach of fiduciary duty to the jury.[12]
 
 II.
 
 33
 Two other errors are alleged by the North Dakota partners which merit brief discussion because the issues may arise again at the new trial. The district court excluded the testimony of Reid Stigen, an expert witness called by the North Dakota partners, as to the market value of the mall--specifically, whether the mall could have been sold for $15,000,000 as contended by the Minnesota partners rather than the actual purchase price of $13,400,000.[13] The district court ruled that Stigen was not qualified to testify as to the value of the mall because he had no substantial experience with syndicating shopping centers, other than one such syndication he was preparing at the time of trial.
 
 
 34
 "Whether to admit expert testimony rests in the discretion of the trial judge." Ellis v. Miller Oil Purchasing Co., 738 F.2d 269, 270 (8th Cir.1984); Fed.R.Evid. 702. We will reverse the district court only if it can be shown that this discretion was clearly abused. Holmgren v. Massey-Ferguson, Inc., 516 F.2d 856, 858 (8th Cir.1975). Stigen's testimony would have been cumulative of the testimony of Darrell Rasmuson, another expert called by the North Dakota partners, who valued the mall at $13,500,000. Under these circumstances, although the district judge's ruling may have been unduly narrow, cf. id. (if the particular subject matter falls within a person's experience or overall knowledge of a specialized discipline, that is sufficient to qualify the witness as an expert), we cannot say that it was a clear abuse of discretion. See Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1101 (8th Cir.1982) (no prejudice from exclusion of cumulative expert testimony).
 
 
 35
 The North Dakota partners also argue that the district court erred in permitting the jury to award the Minnesota partners punitive damages for breach of fiduciary duties.[14] These duties, they contend, arise from the partnership agreement, a contract. Thus, punitive damages cannot be awarded under section 32-03-07 of the North Dakota Century Code, which limits punitive damages to actions "for the breach of an obligation not arising from contract." N.D. Cent.Code Sec. 32-03-07 (1976). We disagree.
 
 
 36
 It is true that the basis of the relationship among the partners is contractual. Schlichenmayer v. Luithle, 221 N.W.2d 77, 82 (N.D.1974). Contrary to the North Dakota partners' assertions, however, their fiduciary duties are not defined in toto in the partnership agreement. As we have already observed, absent an overriding provision in the agreement, the North Dakota courts recognize and impose the full panoply of fiduciary duties in a partnership. See, e.g., Svihl, 216 N.W.2d at 115. Hence, these duties and obligations are imposed by law in addition to the agreement, and we conclude that an award of punitive damages for their breach is not precluded by section 32-03-07. See Powers v. Martinson, 313 N.W.2d 720, 727-28 (N.D.1981) (jury properly awarded punitive damages for breach of statutory obligation of real estate vendor not to make fraudulent representations to vendee despite fact that the parties' underlying relationship was contractual). The district court did not err in instructing the jury that it could assess punitive damages against the North Dakota partners for breach of fiduciary duties.
 
 III.
 
 37
 The district court submitted a number of issues to the jury on a special verdict form: the actual damages arising from breach of the partnership agreement; the wrongful dissolution of the partnership and actual damages arising from the dissolution; various breaches of fiduciary duty by Arvid Benson; breach of fiduciary duty by the North Dakota partners in allowing delay of final sale of the mall and actual damages arising from the delay; and the punitive damages arising from the malice, fraud, or oppression of the North Dakota partners in connection with their breaches of fiduciary duties. Des.Rec. at 460-63. These issues are very narrow and are tied directly to the issues the district court took from the jury through its directed verdict.[15] Therefore, we reverse the judgment of the district court entered on the jury's special verdict as well as on the directed verdict, and we remand this case to the district court for a new trial consistent with this opinion.
 
 
 38
 ROSS, Circuit Judge, stating the decision of the court on the alter ego issue, in which Judge FAGG joins.
 
 
 39
 We affirm the directed verdict on the alter ego issue. In all other respects, we concur in Judge Gibson's opinion. In our view, Gate City was the alter ego of Sun Service in connection with management of North Bismarck Associates, and there is no evidence of any significance on which a jury could base a finding to the contrary.
 
 
 40
 Sun Service is wholly owned by Gate City and was created for the sole purpose of engaging in real estate investment transactions in which Gate City was prohibited by law from participating. As Judge Gibson indicates, the two entities file a consolidated financial statement, and Sun Service's net worth is included in Gate City's net worth for purposes of Gate City's compliance with Federal Home Loan Bank Board regulations. As in Larson v. Unlimited Business Exchange of North Dakota, Inc., 330 N.W.2d 518, 521 (N.D.1983), Gate City "was the sole owner of the corporation [and] received the sole benefit of the corporation * * * thereby becoming personally liable for the debts and obligations of the corporation" as its alter ego.
 
 
 41
 Moreover, Gate City's president is the sole officer and employee of Sun Service. Gate City, not Sun Service, pays him a salary. The two companies have offices in the same building and share an identical board of directors.
 
 
 42
 The observation of minimum corporate formalities is not a controlling factor in determining whether one entity is merely a facade for the dealings of another. See Jablonsky v. Klemm, 377 N.W.2d 560, 563 (N.D.1985) in which observation of corporate formalities did not preclude disregarding the corporate entity. Judge Gibson also emphasizes that this lawsuit is a contract action, and that the appellants chose to deal with Sun Service with knowledge of its relationship with Gate City. However, while the relationship between Sun Service and the other partners originated in contract, the allegations against Sun Service and Gate City sound in tort, i.e., fraud and breach of fiduciary duty. The observation of corporate formalities and the capitalization of Sun Service should not obscure the fact that its corporate actions were taken in the interest of its owner, Gate City, and were dominated and directed by Gate City's board of directors and president. Accordingly, we affirm the district court's directed verdict on this point.
 
 
 
 [1]
 Gate City was not a member of the partnership. The district court found as a matter of law that for the purposes of this lawsuit Gate City was the alter ego of Sun Service, Gate City's wholly-owned subsidiary. As Gate City was held jointly liable to the Minnesota partners with Sun Service, and raises many of the same issues on appeal, we will refer to it for the sake of convenience as one of the North Dakota partners
 
 
 [2]
 The district court, in rejecting the North Dakota partners' motion for judgment notwithstanding the verdict, catalogued some of these tactics. Froemming v. Sun Serv. Co., No. A3-83-90 (D.N.D. Oct. 28, 1985). It concluded that there was evidence that the North Dakota partners voted in 1982 to withhold the partnership cash flow in an effort to force the Minnesota partners to sell. Also, the North Dakota partners, without the consent or knowledge of the Minnesota partners, used partnership funds to retain counsel with whom--through a series of secret meetings--they sought to devise a scheme for the sale of the center over the objection of the Minnesota partners. Id., slip op. at 2. The Minnesota partners labeled these and other actions of the North Dakota partners in their brief and at oral argument as "dirty tricks."
 
 
 [3]
 Again, the vote on whether to value and purchase Cowgill's interest split between the Minnesota partners, who favored such a course, and the remaining North Dakota partners. The Minnesota partners indicated by letter the path they wished to follow; they did not attend the May 1983 partnership meeting at which Sun Service and Benson voted to proceed with liquidation
 
 
 [4]
 We need not trouble ourselves with the question of whether federal or North Dakota standards govern our review of the district court's actions. The two are the same. See Powers v. Martinson, 313 N.W.2d 720, 725 (N.D.1981); Smith v. Michael Kurtz Constr. Co., 232 N.W.2d 35, 38 (N.D.1975). We are aware that the standards we articulate in this opinion are drawn from both federal and state cases. We have long recognized, however, the universality of the directed verdict standard. See England v. Downey, 589 F.2d 374, 376 n. 3 (8th Cir.1979)
 
 
 [5]
 The trial court instructed the jury that Sun Service was the "mere instrumentality" of Gate City. Des.Rec. at 487. The Minnesota partners suggest that the test employed by the district judge was drawn from Lowendahl v. Baltimore O.R.R. Co., 247 App.Div. 144, 287 N.Y.S. 62, aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936), which emphasizes the degree of dominance exerted over one corporate entity by another entity or individual. See id. at 157, 287 N.Y.S. at 76. They also contend that this test clearly was satisfied because Sun Service's only employee was an officer of Gate City throughout the course of the partnership and was compensated solely by Gate City, and that the boards of directors of the two corporations were identical. Regardless of whether these facts standing alone justify directing a verdict in a jurisdiction that employs the Lowendahl test, I believe we must, in this diversity case, analyze the propriety of the district court's action under Jablonsky and Hilzendager, which are the latest statements by the North Dakota Supreme Court about disregarding the corporate entity
 
 
 [6]
 Gate City and Sun Service file a consolidated financial statement, and Sun's net worth is included in Gate's net worth for the purposes of determining whether Gate City meets the minimum level of net worth required to be maintained by regulations of the Federal Home Loan Bank Board. Gate City evidently had some financial problems in the years prior to selling the mall. There is evidence that proceeds of a sale would have a positive impact on Gate City's net worth, a result the Minnesota partners contend Gate City was very anxious to achieve
 
 
 [7]
 Paragraph 8.01 of the agreement reads in full as follows:
 
 
 [8]
 01) Voting. The vote of Partners whose combined balances in their individual capital accounts exceed fifty percent (50%) of the capital of the Partnership shall control any question that may come up for decision in the ordinary course of business. The vote of Partners whose combined balances in their individual capital accounts equal or exceed two-thirds of the capital of the Partnership shall control any question that may come up for a decision outside of the ordinary course of business. Unless stated herein to the contrary, any action taken shall be deemed to be a matter in the ordinary course of business
 Plaintiffs' Exhibit 16 at 5.
 
 
 [8]
 The district judge, in granting the motion for directed verdict, stated:
 [T]here is no jury question on breach of contract because if you assume that the dissolving of the partnership was a good faith effort, there is nothing in the agreement that provides for any sale of the partnership property except by a two-thirds vote, and there is nothing in the agreement that gives the defendant partners the authority to go ahead and make this sale over the objection of the plaintiff partners.
 Transcript Vol. XI at 187.
 
 
 [9]
 The decision of whether to buy out a retiring partner's interest is expressly "out of the ordinary course of business" and requires an affirmative vote of partners whose ownership interest equals or exceeds two-thirds of the total capital of the partnership. Plaintiffs' Exhibit 16 at 7, 9
 
 
 [10]
 This construction of the agreement's language is not "outrageous," "absurd," or "ludicrous," as appellees' counsel suggests. The Minnesota partners assert that if the agreement was in fact ambiguous, the North Dakota partners should have offered extrinsic evidence of the parties' intent. See Zitzow v. Diederich, 337 N.W.2d 799, 801 (N.D.1983) (if intent not apparent on the face of an instrument, the court looks to extrinsic evidence of intent). The record reveals that evidence was introduced of what the partners understood the agreement to mean at the time it was entered. Even if we assume that the North Dakota partners, as defendants, had the burden of proving the meaning of the terms of the agreement, their alleged failure to introduce extrinsic evidence of intent at the trial does not mean that the agreement is unambiguous
 
 
 [11]
 The North Dakota partners suggest in their briefs, both as to this issue and as to the jury's award of punitive damages, that under North Dakota law the scope of a partner's fiduciary duties is entirely defined by the partnership agreement. While it is true that "[t]he partnership agreement in many respects is the law of the partnership," Liechty v. Liechty, 231 N.W.2d 729, 731 (N.D.1975), absent agreement to the contrary the relations among partners are governed by common law and statute. Id. As we observe in the text, North Dakota courts recognize and enforce the fiduciary obligations of partners with full vigor. The North Bismarck Associates partnership agreement does contain a provision which addresses conflicts of interests:
 
 
 [8]
 07) Conflicts of Interest. It is expressly agreed and acknowledged that each of the Partners may engage in, acquire and possess, without limitation or accountability to any of the other Partners, any and all business ventures, professions, callings, pursuits, investments and interests of every nature and description, independently or with others, including, but not limited to, any interest or investment similar to the Partnership property; and it is understood that any Partner may benefit directly or indirectly by virtue of any contract or agreement which the Partnership may enter with any other person or entity in which a Partner may have a direct or indirect interest. However, in the event that a Partner will receive a direct or indirect benefit by virtue of any contract or agreement which the Partnership may enter into, the Partner shall have a duty to disclose any such direct or indirect benefit or interest to the Partnership before the Partnership enters into the contract or agreement
 Plaintiffs' Exhibit 16 at 8.
 The district court evidently concluded that this provision did not relieve the North Dakota partners of their fiduciary duties in disposing of the mall. We see no error in this conclusion as this paragraph does not explicitly reach the question of what duties the partners owe one another in dealing with partnership property.
 
 
 [12]
 There is a great deal of evidence in the record concerning the parties' understanding and interpretation of the terms of the partnership agreement. The North Dakota partners testified that they believed the actions they took leading up to the sale of the mall, including Cowgill's retirement, were consistent with their obligations under the agreement and with the best interests of the whole partnership. They were advised, for example, by two outside attorneys that Cowgill's retirement would trigger dissolution and authorize sale of the mall without violating the partnership agreement. As to the payment of a portion of the brokerage commission to Cowgill, there was testimony that these fees were reasonable and customary in transactions of this kind in North Dakota. Moreover, Cowgill was no longer a member of the partnership at the time the commission was paid. There was also testimony that the decision to pay Cowgill these fees was made at a regularly-called partnership meeting that the Minnesota partners declined to attend. At this same meeting, the partnership authorized the payment of the attorney fees, only a portion of which were generated by what the Minnesota partners characterized as "secret" meetings. The district court did not distinguish between the fees for the alleged clandestine work and the work done incident to the sale itself in directing a verdict and assessing damages on this issue. With regard to the split of the management fee with Sun Service, there is evidence that the Minnesota partners were aware of this arrangement at the time it was set up. There is also evidence that the Minnesota partners were earlier compensated for services they performed or the partnership
 
 
 [13]
 The district court also excluded Stigen's testimony regarding the value of a promissory note received by the partnership as a part of the mall's purchase price. Stigen sought to testify that the note should be valued in terms of its "income potential" rather than by its discounted cash value at the time of sale. The district judge held that evidence of the note's "income potential" was irrelevant to the issue of damages arising from the sale of the mall. As those damages were to be based on a comparison between the mall's market value in cash and the actual proceeds of the sale, we do not believe the district court abused its discretion in excluding Stigen's testimony as irrelevant
 
 
 [14]
 In a related argument, the North Dakota partners contend that the award of punitive damages is excessive and not sustained by the evidence. We need not reach this issue, as we reverse the entire judgment and remand for retrial
 
 
 [15]
 The punitive damages are directly dependent on the district court's instruction to the jury that Sun Service and Cowgill breached their fiduciary duties as a matter of law. The actual damages for breach of the partnership agreement are also directly dependent on the court's determination that the sale of the mall breached the partnership agreement. As to Benson's breach of fiduciary duty, the district court had already instructed the jury that virtually the same conduct by Sun Service and Cowgill constituted a breach of fiduciary duties as a matter of law. Finally, as to the issue of whether the dissolution of the partnership was wrongful, the jury had already been instructed that the sale of the mall, the direct and planned consequence of the dissolution, was both a breach of the partnership agreement and of the fiduciary duties owed by the North Dakota partners. Questions of the intent of the North Dakota partners in dissolving the partnership and the proper interpretation of the partnership agreement, crucial to the issue of whether the dissolution was wrongful, had thus already been resolved by the district court against the North Dakota partners