In re HAUGEN CONSTRUCTION SERVICES, INC., Debtor.

BUTLER MACHINERY, INC., on behalf of itself and all others similarly situated, Plaintiff,

v.

Gary HAUGEN, individually, et al., Defendants.

Bankruptcy No. 85-05321.
Adv. No. 88-7083.

United States District Court,
D. North Dakota,
Southwestern Division.

Sept. 15, 1989.

Robert S. Thomas, Minot, N.D., for Gary Haugen.

Terry C. Smith, Minneapolis, Minn., for plaintiff.

Max D. Rosenberg, Bismarck, N.D., for Gary Haugen and Minot Sand & Gravel, Inc.

## ORDER

CONMY, Chief Judge.

The above-entitled matter before the court is a review of the Bankruptcy Court's report and recommendation issued in the adversary proceeding referenced above. The Defendants have submitted objections to the report and recommendation which recommended that the Defendants Gary Haugen and Minot Sand and Gravel, Inc., be found jointly and severally liable for all the debts of Debtor Haugen Construction Services, Inc., based upon a "piercing the corporate veil" theory.

The court's review of the Bankruptcy Court's report and recommendation is *de novo*. *See* Federal Bankruptcy Rule 9033(d). After thoroughly reviewing the record in this matter, it is the finding of this court that the Bankruptcy Courts report and recommendation is accepted in its entirety. There is ample support for the findings and conclusions set forth in the report and recommendation.

BASED UPON THE FOREGOING, IT IS HEREBY ORDERED THAT THE REPORT AND RECOMMENDATION OF THE BANKRUPTCY COURT IS ACCEPTED. LET JUDGMENT BE ENTERED ACCORDINGLY.

## REPORT AND RECOMMENDATION

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a class action adversary proceeding initiated by a Complaint filed June 22, 1988. The class consists of all of the unsecured creditors of Haugen Construction Services, Inc. (Debtor). Butler Machinery, Inc. (Butler) is the Debtor's main unsecured creditor. On January 30, 1985, Butler obtained a judgment against the Debtor which, with accrued interest, is approximately $821,159.00. In addition to Butler's claim the Debtor's schedule A–3 lists eleven other unsecured creditors with claims totalling $36,715.21. By its complaint the class seeks to hold Gary Haugen and the named defendant corporations of which he is a stockholder, liable for the debts incurred by the Debtor corporation, including Butler's judgment. Gary Haugen is the sole stockholder of the Debtor. The class alleges that the defendants were alter egos of the Debtor. The bankruptcy case underlying this adversary was originally filed as a Chapter 11 case on June 3, 1985. On October 28, 1985, the bankruptcy court ordered an examiner appointed in the case. On May 22, 1986, the case was converted to a Chapter 7 proceeding. Much of the evidence introduced by the class at trial was highlighted in the January 13, 1986, examiner's report. (Plaintiff's exhibit 1.)

As discussed, *infra*, this court has concluded that it has jurisdiction over this adversary as a matter related to a case under Title 11. Section 157(c)(1) of United States Code Title 28 provides that when the parties have not consented to the bankruptcy court entering a final order for judgment the bankruptcy court shall submit proposed findings of fact and conclusions of law to the District Court for entry of

final judgment. The following proposed findings and conclusions are hereby submitted to the District Court.

This case came on for trial on May 22, 1989. From the testimony and exhibits introduced at trial the court finds the following facts:

*Findings of Fact*

Gary Haugen has been involved in the gravel and construction businesses since 1970. He formed Haugen's Construction Services as a sole proprietorship which operated in western North Dakota on road construction and oil well projects. The business involved a large amount of heavy equipment, some of which was collateral for debts owed by Haugen personally. On January 1, 1981, Gary Haugen incorporated his business into Haugen Construction Services, Inc. All of the heavy equipment was transferred into the corporation, but the corporation did not assume all of the debts secured by the equipment. Gary Haugen was the sole shareholder of the corporation. The Debtor corporation did not at the time of its formation, or any time subsequently, issue any shares of stock. Nor was a board of directors ever elected, minutes kept, or any dividends declared. Haugen drew a salary from the Debtor for one year after its formation and then ceased drawing a salary.

Haugen was also involved in several other business enterprises. He was a fifty percent shareholder in Impact Rollers, Inc. Impact Rollers was formed to manage a patent on a piece of machinery developed by Haugen and another individual. Impact Rollers, Inc. also neglected to issue stock shares, elect a board of directors, keep minutes or declare any dividends.

Another of Gary Haugen's enterprises was Haugen Development. This was a sole proprietorship used by Gary Haugen for his non-corporate ventures. During the time period relevant to this case the only independent business activity engaged in by Haugen Development was speculating in the precious metals market.

In February of 1982, Gary Haugen formed Minot Sand and Gravel, Inc. (Minot Sand). Like Haugen's other corporations, Minot Sand did not issue stock, elect directors, keep minutes, or declare dividends. Minot Sand was formed to acquire the assets of Atlas Sand and Gravel (Atlas) including, among other things, real estate and heavy equipment. As part of the purchase transaction Minot Sand acquired the equipment free of liens. After the purchase the Debtor used this equipment to collateralize a loan. The Debtor did not purchase the equipment from Minot Sand before encumbering it. Haugen decided to acquire Atlas because it complimented his construction business in that the Debtor used large quantities of sand and gravel.

The purchase of Atlas was partially funded by the Debtor. The Debtor made a payment of $10,000.00 as an earnest money deposit and also made the $100,000.00 down payment required by the purchase contract at the time of the sale closing. (Plaintiff's exhibits 27, 28.) The Debtor received no promissory notes from Minot Sand in exchange for these payments. Minot Sand financed another portion of the purchase price with the aid of a personal guarantee from Gary Haugen. Haugen received no type of indemnity agreement from the corporation for any liability arising from the guaranty. By December 31, 1982, Minot Sand had a negative net worth of $159,170. (Defendant's exhibit 37.)

About one year after Minot Sand purchased Atlas it built an office building on real estate acquired in the purchase. Both Minot Sand and the Debtor maintained their administrative offices in this building. The Debtor paid no rent and there was no lease agreement between the corporations for the Debtor's use of the building. Gary Haugen ran both corporations from these offices. One bookkeeper maintained the records for both companies. Haugen also acquired possession of a helicopter which he used to supervise and support distant projects for both the Debtor and Minot Sand. The Debtor paid for all of the fuel and maintenance associated with operating the helicopter. Minot Sand made no payments toward the expense of operating the helicopter. Although neither the Debtor

nor Minot Sand owned the helicopter, neither corporation made any rental payments for its use.

At one point when creditors were undertaking collection actions against Minot Sand, Haugen deposited a $100,000.00 payment to Minot Sand for work on an air force base project into his personal Haugen Development account. He did this to shield it from Minot Sand's creditors. He then used this money in his personal account to operate Minot Sand until the money ran out.

The Debtor made several transfers to, and on behalf of, Gary Haugen individually. Between September of 1982 and January of 1985, the Debtor made transfers to Haugen Development totaling $155,500.00. (Plaintiff's exhibits 2, 5, 6, 7, 8.) During the same time period Haugen Development transferred $58,800.00 to the Debtor. (Plaintiff's exhibit 2.) The Debtor also made payments to the American Bank & Trust (American) on loans held in the name of Minot Sand and Gravel and Gary B. Haugen and Janene L. Haugen. The Debtor made eight such transfers totalling $82,765.99. (Plaintiff's exhibits 9, 11, 17, 18, 19, 20, 21, 24.) Gary Haugen considered both the transfers to Haugen Development and the payments to American to be loans. These loans were not represented by promissory notes and the terms of the loans were that Haugen would repay them when he was able.

The Debtor also paid several life insurance premiums for insurance covering Gary Haugen and naming American as the beneficiary. American required this insurance as a condition of financing Haugen and his related entities. It is unclear from the evidence how much of the premium payments should be allocated for financing received by the Debtor. The Debtor paid the full amount of all of the premiums totalling $10,613.20 between March, 1982, and August, 1983. (Plaintiff's exhibits 10, 12, 23.)

The Debtor corporation paid $9,007.54 on January 23, 1981, to the Internal Revenue Service for Gary Haugen's personal income tax liability. (Plaintiff's exhibit 26.) This tax arose as the result of an adjustment to the amount of depreciation on construction equipment deducted by Gary Haugen when he had operated the construction business as a sole proprietorship. He was unaware of this liability at the time the Debtor was incorporated and the Debtor did not assume the liability. The Debtor also paid Gary Haugen's personal dentist bill of $128.00. (Plaintiff's exhibit 25.)

When Minot Sand and the Debtor purchased goods and services from each other invoices would be prepared. The invoices would not, however, be paid. The two corporations carried the invoices to each other on their own books as accounts receivable. Similarly, when Gary Haugen used equipment or workers from either corporation for his own personal use he would be invoiced but not pay the invoices. It was also Gary Haugen's practice with regard to the Debtor to pay corporate expenses with his personal funds whenever he found it expedient. He would not seek reimbursement for these personal expenditures from the Debtor corporation.

The Debtor corporation and Minot Sand also made large intercompany monetary transfers between themselves. Between December 12, 1982, and March 15, 1985, the Debtor issued six checks totalling $38,545.50 to Minot Sand. (Plaintiff's exhibits 2, 3, 13, 24, 25, 16.) During the period from May 17, 1983, to May 5, 1985, Minot Sand transferred $306,647.22 to the Debtor. (Plaintiff's exhibit 2.) These transfers do not include the receivables generated by intercompany sales of goods and services. (Plaintiff's exhibit 2.) Rather, Gary Haugen considered these transfers to be loans. They were not, however, supported by promissory notes or corporate resolutions. Nor were there any specific terms regarding repayment.

In 1984, when Gary Haugen's accountants were preparing tax returns for Minot Sand for 1983, they received a batch of invoices issued by Minot Sand to the Debtor. (Plaintiff's exhibit 33.) These invoices totalled $1,225,840.98. (Plaintiff's exhibit 32.) The accountants explained to Gary Haugen that, as the sole shareholder of

both corporations, he was being whipsawed on taxable income because Minot Sand was on the accrual basis of accounting while the Debtor was on the cash basis. Thus Minot Sand had to recognize income as soon as it invoiced the Debtor. The Debtor, being on the cash basis, would not receive a corresponding taxable income deduction until it actually paid the invoices, which it never did. When Gary Haugen learned this he produced a second batch of invoices from Minot Sand to the Debtor. (Plaintiff's exhibit 34.) He instructed the accountants to substitute the second batch of invoices, totalling $360,940.98, for the first batch. This substitution reduced the amount of the billing from Minot Sand to the Debtor by $864,900.00. It reduced Minot Sand's reportable income by the same amount.

The Debtor also transferred $21,700.00 to Impact Rollers, Inc. (Plaintiff's exhibits 2, 3, 4.) These transactions were treated by Haugen as loans, although they were never evidenced by promissory notes. Haugen purchased equipment for the Debtor through Impact Rollers to take advantage of the lower Original Equipment Manufacturer (O.E.M.) prices available to Impact Rollers. Impact Rollers qualified to purchase at O.E.M. prices because it was developing a new piece of equipment. Haugen was aware, however, that Impact Rollers would lose its O.E.M. designation if it resold parts to the Debtor. He bypassed this problem by simply having Impact Rollers transfer the equipment to the Debtor without issuing an invoice. In exchange the Debtor would periodically make a "loan" payment to Impact Rollers. It is unclear from the evidence whether these payments were a disbursement of loan proceeds from the Debtor to Impact Rollers, or whether the payments were repayments on some type of debt created by the equipment transfer. In either case the loans were not supported by promissory notes.

The transfers made by the Debtor to, or on behalf of, Gary Haugen and his related business entities may be summarized as follows:

| Payee | Amount | Date | Check No. | Exhibit No. |
|---|---|---|---|---|
| Atlas Ready Mix & American State | $100,000.00 | 2–18–82 | 2478 | 27 |
| Rasmusson Realty Trust | 10,000.00 | 1–07–82 | 2247 | 28 |
| Haugen Development | $  9,500.00 | 3–09–84 | 5590 | 8 |
| Haugen Development | 6,500.00 | 11–22–82 | 3810 | 7 |
| Haugen Development | 9,000.00 | 10–13–82 | 3626 | 6 |
| Haugen Development | 80,000.00 | 9–17–82 | 3499 | 5 |
| First American Bank & Trust | $  5,327.00 | 3–28–84 | 5641 | 21 |
| First American Bank & Trust | 16,540.81 | 11–28–83 | 5229 | 20 |
| American State Bank | 12,285.96 | 10–11–83 | 5035 | 11 |
| American Bank & Trust Co. | 5,327.00 | 6–29–83 | 4610 | 19 |
| American Bank & Trust Co. | 10,654.00 | 5–05–83 | 4412 | 18 |
| American Bank & Trust Co. | 166,540.81 | 3–14–83 | 4239 | 17 |
| American State Bank | 3,826.85 | 7–27–82 | 3235 | 9 |
| American State Bank | 12,263.56 | 4–21–82 | 2741 | 24 |
| Old Line Life Ins. | 439.40 | 8–19–83 | 4835 | 12 |
| Manhattan Nat'l Life | 4,620.00 | 3–28–83 | 4293 | 2 |
| Metro Life | 417.00 | 3–28–83 | 4202 | 2 |
| Old Line Life Ins. | 401.70 | 11–16–82 | 3768 | 2 |
| Metro Life Ins. | 148.40 | 9–14–82 | 3451 | 2 |
| Employees Mutual | 735.00 | 9–14–82 | 3493 | 10 |
| Old Line Life Ins. | 401.70 | 8–17–82 | 3331 | 2 |
| Manhattan Nat'l Life Ins. | 3,450.00 | 3–23–82 | 2610 | 23 |
| Internal Revenue Service | 9,007.54 | 1–23–81 | 196 | 26 |
| David G. Keup, D.D.S. | 128.00 | 7–01–81 | 1055 | 25 |
| Minot Sand & Gravel | 13,000.00 | 3–05–85 | 6500 | 2 |

| Payee | Amount | Date | Check No. | Exhibit No. |
|-------|-------:|------|-----------|-------------|
| Minot Sand & Gravel | 1,500.00 | 2–03–84 | 5458 | 16 |
| Minot Sand & Gravel | 45.50 | 5–13–83 | 4440 | 2 |
| Minot Sand & Gravel | 3,000.00 | 1–27–83 | 4066 | 15 |
| Minot Sand & Gravel | 15,000.00 | 1–12–83 | 4006 | 14 |
| Minot Sand & Gravel | 6,000.00 | 12–22–81 | 3928 | 13 |
| Impact Rollers | 4,000.00 | 6–23–84 | 5823 | 2 |
| Impact Rollers | 12,000.00 | 3–15–84 | 5607 | 4 |
| Impact Rollers | 5,000.00 | 1–17–84 | 5405 | 3 |
| Impact Rollers | 700.00 | 7–07–82 | 3144 | 2 |

The Debtor's books and records were deficient in several respects. With regard to all of the Debtor's transfers to, or on behalf of, Gary Haugen and Minot Sand, it is impossible to discern the nature of the payments from the Debtor's books. (Plaintiff's exhibits 3–28.) The payments are not designated as personal, or on behalf of Gary Haugen or Minot Sand. Moreover, since the Debtor did not maintain any general ledger system, it is impossible to tell exactly which debts it owed to whom. When the receiver prepared his report he was forced to obtain promissory note ledgers from American to determine the principal amounts owing on the Debtor's obligations, and further, to determine which of the promissory notes upon which the Debtor was making payments were actually the Debtor's obligations.

Gary Haugen made no distinction between his personal funds and the funds held by his various corporations. He candidly testified that he believed that if the corporations had money he could take the money and use it wherever he needed it because he owned all of the corporations and it was all his money.

### Conclusions of Law

1.

The threshold legal issue raised in this case is whether this court has jurisdiction over a suit by creditors against non-debtor third parties for recovery under an alter ego theory. At a pre-trial conference held on May 22, 1989, the court issued an oral order concluding that it did have related matter jurisdiction under 28 U.S.C. § 157(c)(1). The defendants have reasserted their jurisdictional argument in their post-trial brief. The court will construe this post-trial argument as a motion for reconsideration of its May 22, 1989, order.

The United States Court of Appeals for the Eighth Circuit stated its test for determining whether a civil proceeding is "related" to a bankruptcy proceeding in *National City Bank v. Coopers & Lybrand*, 802 F.2d 990 (8th Cir.1986). The Court of Appeals reasoned, "The test is whether the outcome of the civil proceeding could conceivably have any effect on the estate— whether the outcome could alter the debtor's rights, liabilities, options, or freedom of action." *Id.* at 994; *In re Titan Energy, Inc.*, 837 F.2d 325, 329 (8th Cir.1988). In a subsequent decision the Court of Appeals concluded that the outcome of a civil proceeding to foreclose and collect a guarantee would effect the estate because if the guaranty could not be collected the money would have to come from the estate and the unsecured creditors would get nothing. *In re Dogpatch, U.S.A., Inc.*, 810 F.2d 782, 786 (8th Cir.1987). *See In re Cassidy Land & Cattle Co., Inc.*, 836 F.2d 1130, 1132 (8th Cir.1988).

As support for their position that the court does not have related jurisdiction the defendants rely on the case of *Wayne Film Systems v. Film Recovery Systems*, 64 B.R. 45 (N.D.Ill.1986). In *Wayne* the District Court concluded that an alter ego lawsuit was unrelated to the bankruptcy proceedings because the creditor was seeking recovery in its own behalf and not requesting that any recovery be added to the estate nor shared with other creditors. *Id.* at 50. *Wayne* is distinguishable from the instant case in that the plaintiff in the instant case is a class composed of all of the unsecured creditors of the Debtor. This class is identical to the entities that would benefit from any recovery made by the estate.

Moreover, in light of the Eighth Circuit's broad test that a matter is related if it "conceivably" may alter a debtor's liabilities, this court would conclude that even if Butler had brought this case individually, satisfaction of its $821,159.00 judgment from assets other than estate assets would have a significant effect on the estate's liabilities. Accordingly, this adversary proceeding is related to the Debtor's bankruptcy proceeding and is within this court's jurisdiction.

### 2.

■ The defendants also re-argue their position that this adversary proceeding is barred by res judicata. The court also issued an oral ruling that res judicata does not apply in this instance at the May 22, 1989, pre-trial conference. The presentation of this argument in the post-trial brief will also be treated as a motion for reconsideration. The defendants assert that a state court has previously determined that Gary Haugen has no liability for the debts of Haugen Construction Service, Inc. in *Butler Machinery Co. v. Haugen Construction, Inc., Gary Haugen, individually and dba Haugen's Construction Service,* Civil No. 51149 (District Court, Ward County, North Dakota January 30, 1985). In that case, however, the state court only determined that Haugen had no liability for the Debtors' debts as the result of a guarantee. *Id.* at 11. The issue of whether the corporate veil should be pierced is a separate claim which was not presented to the state court and is not barred in the instant action by the doctrine of res judicata.

### 3.

■ The next defense raised by the defendants is that this action is barred by a statute of limitations. Section 28–01–16(1) of the North Dakota Century Code provides that an action based upon a contractual liability must be commenced within six years after the claim for relief has accrued. The defendants assert that this alter ego action is based upon a financing contract between Butler and the Debtor and further that the statutory time period began to run as of the date of the contract which was executed before 1982. This argument fails for several reasons. There is no contractual basis offered as a reason to disregard the corporate entity. Alter ego liability is premised upon a defendant's course of actions over a span of time. It is not liability triggered by a single event such as the execution of a contract. Hence this case is not subject to the contractual statute of limitations. Moreover, the monetary transfers which the class asserts disregarded the Debtor's corporate entity occurred between January 23, 1981, and March 5, 1985, as recently as less than four years before the class filed the instant complaint. Accordingly, the statute of limitations defense is without merit.

### 4.

■ The substantive issue in this case is whether the class may pierce the Debtor's corporate veil to reach the assets of Gary Haugen and Minot Sand. The North Dakota Supreme Court summarized the grounds necessary to justify a pierce of the corporate veil in *Hilzendager v. Skwarok,* 335 N.W.2d 768 (N.D.1983). The court concluded:

> It is the general rule that officers and directors of a corporation are not generally liable for the ordinary debts of the corporation ... However, in *Schriock v. Schriock,* 128 N.W.2d 852, 866 (N.D. 1964), our court stated:
>
> > '... but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.'
>
> (citations omitted).
>
> It has also been held that factors considered significant in determining whether or not to disregard the corporate entity include: insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records,

and the existence of the corporation as merely a facade for individual dealings. (citations omitted).

\* \* \* \* \* \*

We believe the facts in the instant case, recited earlier herein, are clearly sufficient for disregarding the corporate entity and holding the directors and officers of Holiday Air and Holiday Leasing personally liable.

The record is replete with examples of the defendants' disregard for corporate formalities. The corporate minute books of both corporations were not kept current. Many of the corporate records have disappeared. The record also indicates that several of the defendants were unaware of and unconcerned about their various duties as directors and officers. Funds and assets of both corporations were commingled and disbursed haphazardly.

*Id.* at 774.

The United States Court of Appeals for the Eighth Circuit has also had occasion to apply North Dakota law regarding piercing the corporate veil. *See Froemming v. Gate City Federal Savings and Loan Association,* 822 F.2d 723 (8th Cir.1987). The Court of Appeals affirmed a directed verdict which held that a wholly owned subsidiary corporation was the alter ego of its parent corporation, stating:

> As in *Larson v. Unlimited Business Exchange of North Dakota, Inc.,* 330 N.W.2d 518, 521 (N.D.1983) Gate City 'was the sole owner of the corporation [and] received the sole benefit of the corporation ... thereby becoming personally liable for the debts and obligations of the corporation' as its alter ego.
> Moreover, Gate City's president is the sole officer and employee of Sun Service.... The two companies have offices in the same building and share an identical board of directors.
> The observation of minimum corporate formalities is not a controlling factor in determining whether one entity is merely a facade for the dealings of another. *See Jablonsky v. Klemm,* 377 N.W.2d

560, 563 (N.D.1985) in which observation of corporate formalities did not preclude disregarding the corporate entity.... The observation of corporate formality and the capitalization of Sun Service should not obscure the fact that its corporate actions were taken in the interest of its owner, Gate City, and were dominated and directed by Gate City's board of directors and president.

*Id.* at 733–34.

In the instant case the Debtor did not issue shares of stock. It did not elect directors, keep minutes, or declare dividends. It also failed to maintain accounting records which were adequate to distinguish its own debts from the debts of other entities. In short, the Debtor completely neglected any type of corporate formality. The assets of the Debtor, Gary Haugen and Minot Sand were commingled without hesitation. Moreover, none of the three entities recorded the transactions in such a way as to track the transfers from and to each entity.

In the *Froemming* case the Eighth Circuit concluded that an owner was the alter ego of a corporation when corporate actions were dominated and directed by the owner in the owner's self interest. *Id.* This principle is illustrated in this case by Gary Haugen's substitution of invoices to cure the cash and accrual basis taxable income problem. He arbitrarily reduced Minot Sand's receivables and the Debtor's payables by $864,900.00. Haugen undertook this action to reduce the amount of tax liability that he personally would have to bear as sole owner of both companies through the tax liability incurred by both corporations in total. There was nothing extraordinary about each corporation's taxable income situation when viewed from the perspective of each individual corporation. It was only when the assets of the corporations and Haugen were viewed as a pool that the taxable income dilemma became apparent.

Indeed Haugen did operate his businesses as a single pool of assets. Haugen, the Debtor, and Minot Sand shared their assets between each other for the purpose of col-

lateralizing loans as demonstrated by the Debtor's use of Minot Sand's equipment to collateralize a loan and by Gary Haugen's use of his personal property to collateralize the loan by which Minot Sand partially paid for Atlas. He undertook this action without receiving any type of indemnity agreement. The three entities also used each others assets without any type of compensation, for example, the office building and helicopter. Finally, the three entities paid each other's expenses. Haugen personally paid corporate expenses without reimbursement. Likewise the corporations paid his personal expenses, for example dental bills and life insurance. These transfers were unsupported by promissory notes and were to be repaid at an uncertain future date when the recipient was able to repay. They were more in the nature of shared assets than loan transfers between independent entities.

The pooling method of asset management used by Haugen, the Debtor and Minot Sand is further illustrated by the transaction in which a payment due to Minot Sand was deposited into Haugen's personal Haugen Development account. The Minot Sand corporation had no obligation to turn that payment over to Haugen. Likewise, Haugen had no obligation to pay Minot Sand's operating expenses from his personal account. When both entities are viewed as a single enterprise, however, it is apparent that Haugen believed that he was benefiting the entire enterprise by shielding assets from Minot Sand's creditors. From the continuing course of dealing between Haugen, the Debtor and Minot Sand, the court concludes that the three entities operated as a single enterprise and that Haugen and Minot Sand were alter egos of the Debtor. The class has not met its burden of proving that Impact Rollers was an alter ego of the Debtor.

It would be fundamentally unfair for Gary Haugen to operate the three entities' assets as a pool for the purpose of advancing his business enterprise while at the same time insulating his personal assets and Minot Sand's assets from liability incurred by essentially the same business enterprise.

Accordingly, for the reasons stated, it is recommended that Gary Haugen personally and Minot Sand and Gravel, Inc. are jointly and severally liable for all of the debts of Haugen Construction Services, Inc. as of June 3, 1985, (the date of the Debtor's bankruptcy petition) including the following:

Acme Electric $1,730.00; Anderson Reports $60.00; Bearing & Drives $7,724.96; Butler Machinery $821,159.00 (arising from judgment obtained in Civil No. 51149 entered in Ward County District Court); Krebsbach, Inc. $422.64; Midwest Industrial $1,425.08; Midwest Industrial $10,020.15; Northwest Equipment $707.55; Northwest Sheet & Iron Works $543.78; Rued Insurance $10,000.00; Sweeney Bros. $3,766.93; Wibe Electronics $314.12.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated this 11th day of July, 1989.